No. 22-5151

IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

SISTERS FOR LIFE, INC.; ANGELA MINTER;
KENTUCKY RIGHT TO LIFE ASSOCIATION, INC. (**22-5150**),
EDWARD HARPRING; MARY KENNEY (**22-5151**),
*Plaintiffs-Appellants,*

v.

LOUISVILLE-JEFFERSON COUNTY, KY METRO GOVERNMENT, GREG
FISCHER, Mayor; ERIKA SHIELDS, Chief of Police, Louisville Metro Police
Department; MIKE O'CONNELL,
*Defendants-Appellees*

Appeal from the United States District Court for the
Western District of Kentucky, Case Nos. 3:21-cv-367, 3:21-cv-691

**OPENING BRIEF OF PLAINTIFFS-APPELLANTS
EDWARD HARPRING AND MARY KENNEY**

EDWARD L. WHITE III
ERIK M. ZIMMERMAN*
AMERICAN CENTER FOR LAW
 & JUSTICE
3001 Plymouth Road, Suite 203
Ann Arbor, Michigan 48105
Tel.: 734-680-8007
Email: ewhite@aclj.org

*not admitted in this jurisdiction

April 11, 2022

FRANCIS J. MANION
GEOFFREY R. SURTEES
AMERICAN CENTER FOR LAW
 & JUSTICE
Post Office Box 60
New Hope, Kentucky 40052
Tel.: 502-549-7020
Email: fmanion@aclj.org

*Counsel for Harpring and Kenney*

**Oral Argument Requested**

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Sixth Circuit
Case Number: No. 22-5151
Case Name:
SISTERS FOR LIFE, INC.; ANGELA MINTER; KENTUCKY RIGHT TO LIFE
ASSOCIATION, INC. (**22-5150**); EDWARD HARPRING; MARY KENNEY (**22-5151**)
v.
LOUISVILLE-JEFFERSON COUNTY, KY METRO GOVERNMENT; GREG
FISCHER, Mayor; ERIKA SHIELDS, Chief of Police, Louisville Metro Police
Department; MIKE O'CONNELL

Name of counsel:  Francis J. Manion

Pursuant to 6th Cir. R. 26.1, the Plaintiffs-Appellants Edward Harpring and Mary
Kenney make the following disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?

        No.

2.      Is there a publicly owned corporation, not a party to the appeal, that has a
        financial interest in the outcome?

        No.

                              /s/ Francis J. Manion
                              FRANCIS J. MANION
                              American Center for Law
                                & Justice
                              Post Office Box 60
                              New Hope, Kentucky 40052
                              Tel.: 502-549-7020
                              Email: fmanion@aclj.org

        Dated: April 11, 2022        *Counsel for Harpring and Kenney*

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST ........................................................................................................ i

TABLE OF AUTHORITIES ................................................................................. iv

STATEMENT REGARDING ORAL ARGUMENT ....................................... vii

STATEMENT OF JURISDICTION ................................................................... 1

STATEMENT OF THE ISSUES ......................................................................... 1

INTRODUCTION ................................................................................................. 1

STATEMENT OF THE CASE ............................................................................. 3

SUMMARY OF ARGUMENT .......................................................................... 11

STANDARD OF REVIEW ................................................................................. 12

ARGUMENT ........................................................................................................ 14

I.     Plaintiffs are Likely to Succeed on the Merits of their First Amendment Claim ....................................................................................... 14

     A.    The Burden is on Metro to Prove Narrow Tailoring ............................... 14

     B.    *McCullen* and its Analysis Determines the Outcome of this Case ........... 16

     C.    Metro Failed to use less Intrusive Measures in Addressing Issues at EMW as *McCullen* Requires ......................................................... 22

     D.    The Ordinance Fails Narrow Tailoring Because of its Geographical Overinclusiveness ............................................................... 28

     E.    The Ordinance Substantially Burdens Plaintiffs' Speech ........................ 31

     F.    *Hill v. Colorado* Has as Much Relevance in this Case as it Did in *McCullen*: None .................................................................................. 34

     G.      The District Court's Reliance on Other Buffer Zone Decisions was Misplaced, and the Weight it Placed on the Size of the Ordinance's Buffer Zone was Erroneous ................................................................38

II.     The Ordinance is Unconstitutionally Vague ...........................................40

     A.      When Buffer Zones are Operational ...........................................41

     B.      Crossing Through Buffer Zones .................................................45

III.    The Equitable Factors Favor a Preliminary Injunction .........................47

CONCLUSION ..................................................................................................50

CERTIFICATE OF COMPLIANCE ................................................................51

CERTIFICATE OF SERVICE ..........................................................................52

DESIGNATION OF COURT DOCUMENTS .................................................53

ADDENDUM

     Louisville Ordinance O-179-21 ......................................................... Add. 1

# TABLE OF AUTHORITIES

## Cases

*729, Inc. v. Kenton Cty. Fiscal Court,*
 515 F.3d 485 (6th Cir. 2008) ........................................................ 44

*ACLU Fund of Mich. v. Livingston Cty.,*
 796 F.3d 636 (6th Cir. 2015) ........................................................ 49

*Bartnicki v. Vopper,*
 532 U.S. 514 (2001) ..................................................................... 16

*Billups v. City of Charleston,*
 961 F.3d 673 (4th Cir. 2020) ....................................................... 27

*Bruni v. City of Pittsburgh,*
 824 F.3d 353 (3d Cir. 2016) .................................................... 15, 39

*Bruni v. City of Pittsburgh,*
 941 F.3d 73 (3d Cir. 2019) ........................................................... 38

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.,*
 511 F.3d 535 (6th Cir. 2007) ....................................................... 12

*Cnty. Sec. Agency v. Ohio Dep't of Commerce,*
 296 F.3d 477 (6th Cir. 2002) ................................................... 12, 48

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*
 657 F.3d 936 (9th Cir. 2011) ....................................................... 29

*Cutting v. City of Portland,*
 802 F.3d 79 (1st Cir. 2015) .......................................................... 29

*Dambrot v. Cent. Mich. Univ.,*
 55 F.3d 1177 (6th Cir. 1995) ....................................................... 40

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.,*
 274 F.3d 377 (6th Cir. 2001) ....................................................... 49

*Elrod v. Burns,*
    427 U.S. 347 (1976) ................................................................................................ 1

*Eubanks v. Wilkinson,*
    937 F.2d 1118 (6th Cir. 1991) ........................................................................... 44

*Forsyth County v. Nationalist Movement,*
    505 U.S. 123 (1992) ............................................................................................ 43

*Hamilton's Bogarts, Inc. v. Michigan,*
    501 F.3d 644 (6th Cir. 2007) ...................................................................... 12, 48

*Hill v. Colorado,*
    530 U.S. 703 (2000) ................................................................................... *passim*

*Jobe v. City of Catlettsburg,*
    409 F.3d 261 (6th Cir. 2005) ............................................................................ 36

*LKS Pizza, Inc. v. Commonwealth,*
    169 S.W.3d 46 (Ky. Ct. App. 2005) ................................................................ 44

*Madsen v. Women's Health Center, Inc.,*
    512 US 753 (1994) .............................................................................................. 37

*Martin v. City of Albuquerque,*
    396 F. Supp. 3d 1008 (D.N.M. 2019) ............................................................. 27

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ................................................................................... *passim*

*McNeilly v. Land,*
    684 F.3d 611 (6th Cir. 2012) ............................................................................ 13

*Moore v. Sims,*
    442 U.S. 415 (1979) ............................................................................................ 45

*NAACP v. Button,*
    371 U.S. 415 (1963) ............................................................................................ 30

*Newsom v. Norris,*
    888 F.2d 371 (6th Cir. 1989) ............................................................................ 34

*Nightclubs, Inc. v. City of Paducah*,
    202 F.3d 884 (6th Cir. 2000) ........................................................ 12

*Ohio Citizen Action v. City of Englewood*,
    671 F.3d 564 (6th Cir. 2012) ........................................................ 14

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009) ...................................................................... 49

*Price v. Chicago*,
    915 F.3d 1107 (7th Cir. 2019) ...................................................... 38

*Reno v. ACLU*,
    521 U.S. 844 (1997) ...................................................................... 41

*Reynolds v. Middleton*,
    779 F.3d 222 (4th Cir. 2015) ................................................ 15, 29

*Riley v. National Fed'n of Blind*,
    487 U.S. 781 (1988) ...................................................................... 30

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ...................................................................... 49

*Schaumburg v. Citizens for a Better Environment*,
    444 U.S. 620 (1980) ...................................................................... 30

*Schenck v. Pro-Choice Network of Western N.Y.*,
    519 U.S. 357 (1997) ................................................................ 37, 46

*Turco v. Englewood*,
    935 F.3d 155 (3d Cir. 2019) .................................................7, 38, 41

*United States v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000) ...................................................................... 14

*United States v. Thirty-Seven (37) Photographs*,
    402 U.S. 363 (1971) ...................................................................... 44

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ...................................................................... 15

**Statutes and Ordianances**

18 U.S.C. § 248 ........................................................................19, 20, 21

28 U.S.C. § 1292(a)(1) ...........................................................................1

28 U.S.C. § 1331 ....................................................................................1

2000 Mass. Ch. 217 .............................................................................. 42

Mass. Gen. Laws, ch. 266, § 120E½(d) ............................................. 40

Englewood Code of Ordinances § 307-3 ........................................... 42

Louisville Ordinance O-179-21 ................................................... *passim*

## STATEMENT REGARDING ORAL ARGUMENT

This interlocutory appeal presents important issues of constitutional law. The district court incorrectly denied Plaintiffs-Appellants Edward Harpring and Mary Kenney's motion for a preliminary injunction, which requested that the district court enjoin Louisville's Ordinance O-179-21, a buffer zone Ordinance. Harpring and Kenney maintain that the Ordinance infringes their constitutional rights to engage in pro-life sidewalk counseling in the public forums of Louisville. Oral argument will aid this Court's review of these important issues.

## STATEMENT OF JURISDICTION

The district court had original jurisdiction over this action pursuant to 28 U.S.C. § 1331. The district court issued its order denying Harpring and Kenney's motion for a preliminary injunction on February 25, 2022. [PI Order, RE 55, Page ID # 2268.] Harpring and Kenney timely filed their notice of appeal on February 28, 2022. [Notice of Appeal, RE 57, Page ID # 2299.] This Court has jurisdiction over this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

Whether the district court reversibly erred in denying Harpring and Kenney's motion for a preliminary injunction.

## INTRODUCTION

For many years, Plaintiffs-Appellants Edward Harpring and Mary Kenney have been engaging in a form of speech the United States Supreme Court has called "the essence of First Amendment expression" in a traditional public forum in the City of Louisville, Kentucky. *McCullen v. Coakley*, 573 U.S. 464, 488-89 (2014). Louisville's buffer zone Ordinance, No. O-179-21, however, has not merely burdened their speech, but has effectively and completely cut off for them that essential form of expression. Their injury is readily apparent, indisputable, and irreparable. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").

This case is controlled by the unanimous Supreme Court decision in *McCullen*. In enacting the Ordinance, Louisville Metro ignored *McCullen*'s clear teaching. On its face and as applied, the Ordinance shows scant recognition of even the minimum requirements of *McCullen* regarding narrow tailoring. (The Ordinance's recitals read like the brief of the losing side in *McCullen*.) Also, it is either massively overinclusive geographically, or, it unlawfully grants to scores of private entities a hitherto unheard of "heckler's veto," delegating to them unbridled discretion to shut down traditional public forums. The Ordinance, moreover, is impermissibly vague in numerous and sometimes contradictory respects.

Plaintiffs easily satisfy the requirements for issuance of a preliminary injunction. Proper analysis of the challenged Ordinance using controlling Supreme Court precedent shows a substantial likelihood of success on the merits on First Amendment and due process grounds. The irreparable injury to Plaintiffs' constitutional freedoms is palpable and, as this Court has noted, necessarily triggers findings of no harm to others and serving of the public interest. This Court should reverse the district court's order and enter a preliminary injunction to prevent the continuing and irreparable injury to Plaintiffs' constitutional freedoms.

## STATEMENT OF THE CASE

For the better part of four decades, Edward Harpring has engaged in "sidewalk counseling"[1] on the public sidewalks adjacent to and in the vicinity of the EMW abortion clinic on Market Street in downtown Louisville. [Verified Complaint, 3:21-cv-691, RE 1, Page ID # 4, ¶ 21.][2] Mary Kenney has been doing likewise for the past 15 years. [*Id.*] Harpring and Kenney share a deeply held religious belief regarding the sanctity of human life, including the unborn. [*Id.* at Page ID # 4, ¶ 19.] This belief compels them to try to speak with and offer help to women seeking abortions at EMW. They do this by trying to approach such women in a caring manner, to walk alongside them, and to offer words of compassion, empathy, and consolation. [*Id.* at Page ID # 4, ¶ 21-22.] They also try to hand women pamphlets and other literature showing alternatives to abortion. [*Id.* at Page ID # 4, ¶ 21.]

Harpring and Kenney do not go to the site to "protest" or "demonstrate" for or against abortion. On the contrary, they believe that the kind of loud, often harsh rhetoric and actions commonly associated with protests and demonstrations would be

---

[1] In *McCullen*, the Supreme Court defined "sidewalk counseling" as "involv[ing] offering information about alternatives to abortion and help pursuing those options" [by engaging in] "personal, caring, consensual conversations with women about various alternatives." *McCullen*, 573 U.S. at 464, 489.

[2] Harpring and Kenney's lawsuit was docketed as Case No. 3:21-cv-691. Their lawsuit was eventually consolidated with Case No. 3:21-cv-367. Docket references in this brief that refer to their original case will have Case No. 3:21-cv-691 in the citation. The other docket references, without any case number, will be to the lead case, Case No. 3:21-cv-367.

detrimental to their goals. [*Id.* at Page ID # 5, ¶ 25.] Neither Plaintiff engages in conduct that could be considered obstructing, trespassing, assaulting, or stalking of EMW patients, patients' companions, or staff. [*Id.* at Page ID # 5, ¶ 26.]

For Harpring and Kenney, when sidewalk counseling, every second counts. For example, Harpring specifically recalls one patient with whom he was walking and speaking right up to the area in front of the clinic door—an area that now falls within the boundaries of the buffer zone created by the Ordinance—who, shortly after entering EMW, came back out and told him that the last thing he had said to her caused her to change her mind about going through with an abortion. [*Id.* at Page ID # 5, ¶ 24.]

On May 20, 2021, Louisville Metro Council passed the Ordinance which is the subject matter of this case. The mayor signed the Ordinance, and it took effect on June 2, 2021. [*Id.* at Page ID # 5, ¶ 27.] The Ordinance begins with three generic recitals about Metro Council's concern for unimpeded access to healthcare facilities and a "documented history of obstruction and interference" with access to such facilities in Louisville. However, the only "documented history" referred to on the face of the Ordinance is contained in the next ten recitals which mention one—and only one—healthcare facility: EMW Women's Surgical Center ("EMW"). [Ex. A, Ordinance, 3:21-cv-691, RE 1-1, Page ID # 20.]

Following these exclusively EMW-related recitals is a series of recitals expressing the Council's respect for First Amendment freedoms, and its conclusion that curtailing those freedoms in traditional public forums in Louisville by creating buffer zones that

"do not impede the rights of protestors" is warranted under decisions of "courts across the United States, including the United States Supreme Court." [*Id.* at Page ID # 21-22.] Only one such decision, however, is specifically cited and quoted: *Hill v. Colorado*, 530 U.S. 703, 730 (2000). Conspicuous by its absence in the Ordinance's recitals about the legal basis for its adoption is any reference to the most recent, clearly controlling, and directly on point decision of the United States Supreme Court: *McCullen v. Coakley*, 573 U.S. 464 (2014).

Perhaps not coincidentally, also *absent* from the Ordinance's lengthy recitals is *any mention* of the following facts the *McCullen* Court viewed as prerequisites to a government's resort to closing traditional public forums by means of buffer zones: previous citations, arrests, or prosecutions by Metro under already existing laws against obstruction and interference; previous efforts by Metro to enact legislative measures or adopt law enforcement policies that would not involve cutting off part of the public forum to speech; and any previous efforts by Metro to obtain injunctive relief that would target only lawbreakers and those acting in concert with them. The only references to law enforcement difficulties justifying the Ordinance's restrictions are two recitals that mention the need of the Louisville Metro Police Department ("LMPD") "to make judgement calls" about whether enforcing existing laws would violate First Amendment rights and how the Ordinance would eliminate that need. [Verified Complaint, 3:21-cv-691, RE 1, Page ID # 21.]

5

Following the Ordinance's recitals come definitions of "Driveway," "Entrance," and "Healthcare facility." [Verified Complaint, 3:21-cv-691, RE 1-1, Page ID # 23-24, § I(A).] The latter term appears to encompass scores of entities, public and private, for-profit or not, "and others providing similarly organized services regardless of nomenclature." [*Id.* at Page ID # 24.]

After the definitions comes Section I (B) ("Access to a healthcare facility"). Subsection (B)(1) prohibits knowingly obstructing, detaining, hindering, impeding, or blocking someone's entry to or exit from a health care facility. *Id.* Subsection (B)(2) states that no person shall knowingly "enter, remain on, or create any obstruction within" a healthcare facility's driveway, or "within a 'buffer zone' on the public way or sidewalk extending from the entrance of a healthcare facility to the closest adjacent sidewalk curb and 10 feet from side to side during the facility's posted business hours." [*Id.*]

Next, the Ordinance lists four classes of persons who are exempt from its prohibitions: persons entering or exiting the health care facility; law enforcement, other first responders and municipal agents acting within the scope of their employment; employees or agents of the facility acting within the scope of their employment; and "persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility." [*Id.*]

Section I (C) ("Signage") follows. This section says that the Department of Public Works ("DPW") "shall, at the request of a healthcare facility, paint or lay on the

6

public way or sidewalk two easily-distinguishable demarcation lines running from either side of the facility entrance to the closest adjacent sidewalk curb and extending 10 feet from each other." [*Id.* at Page ID # 24-25.] It further dictates that healthcare facilities "shall" post their buffer zones with signage reading: "Healthcare facility: No standing within this zone. [Metro Ordinance]." [*Id.* at Page ID # 25.] The section contains no language giving the DPW any discretion to deny such a request. Any of the myriad of "healthcare facilities" in Louisville/Jefferson County Metro need merely request a buffer zone closing down a part of a traditional public forum—for any reason at all— and that request "shall" be granted.[3] [*Id.*]

Sections I (D) and (E) of the Ordinance set up a system of reporting, monitoring, and documentation. In Section I (D), responsibility is given to the DPW to solicit from any facility requesting the demarcation lines information regarding the efficacy of the buffer zone and reporting the results to Metro Council. [*Id.*] In Section I (E), healthcare facilities with buffer zones are charged with monitoring the zones and providing to DPW, the Department of Public Health and Wellness, and LMPD, every six months, documentation of "obstructions" created in the buffer zones, "and instances when anyone other than those allowed by the ordinance are otherwise present in the buffer zone." [*Id.*]

---

[3] As discussed *infra*, unlike the statute at issue in *McCullen*, and the ordinance at issue in *Turco v. City of Englewood*, 935 F.3d 155 (3d Cir. 2019), Louisville's Ordinance does *not* contain language stating that a buffer zone *only* exists if its boundaries are marked and posted on the sidewalk.

Following Metro's adoption of the Ordinance in June 2021, a set of lines 10 feet apart was painted by Metro on the sidewalk going from the curb at Market Street to the entrance doors of EMW. [Verified Complaint, 3:21-cv-691, RE 1, Page ID # 7, ¶ 37.] More recently, on October 12, 2021, signs were posted on the edge of EMW's property about 30 feet to either side of the painted lines. [*Id.* at Page ID # 7, ¶ 38.] The signs do not contain the specific language called for by the Ordinance. Instead, they read: "Healthcare Facility: No Standing or Obstructions In This Zone – LMCO §132.09." [*Id.*]

The effect of the Ordinance on Harpring and Kenney's sidewalk counseling efforts has been profound. [*Id.* at Page ID # 8, ¶ 39.] Before the appearance of the buffer zone, they were able to approach women on the sidewalk leading to the entrance to EMW and walk alongside them, speaking in a quiet, caring, personal manner while handing them pamphlets with information about abortion alternatives. [*Id.* at Page ID # 8, ¶ 40.] Harpring estimates that, before the Ordinance went into effect, around 50-60 times a year he and other sidewalk counselors were successful in persuading women to choose alternatives to abortion, frequently in the last few feet before they entered EMW. [*Id.* at Page ID # 5, ¶ 23.] That kind of approach is now foreclosed by the buffer zone, which requires counselors to come to a dead halt on the white lines of the no-speech zone and abruptly cease their efforts. [*Id.* at Page ID # 8.]

Even worse, EMW and its counselors have now devised a strategy that uses the buffer zone to effectively eliminate any chance of caring, personal conversation

between sidewalk counselors and patients entering the clinic. [*Id.*] As described by Harpring and Kenney, the clinic now either directs patients to be dropped off at the curbside entrance to the buffer zone or meets them at some remote location in a marked "clinic shuttle." [*Id.* at Page ID # 8-9, ¶¶ 42-43.] The shuttle transports them to the entrance to the buffer zone where they are met by clinic escorts. The escorts flank the patients as they walk to the entrance. This makes it impossible for sidewalk counselors to hand pamphlets to patients as the escorts typically grab the pamphlets or block the counselors' hands from reaching the vicinity of the patient's hand, even if patients may want to receive the information. [*Id.* at Page ID # 9, ¶¶ 43-44.]

In addition to eliminating Plaintiffs' ability to engage in leafletting and pamphleteering—activities the *McCullen* Court called "the essence of First Amendment expression"—the buffer zone outside EMW forces Plaintiffs to choose between abandoning sidewalk counseling, with its emphasis on quiet, caring, personal encounters between counselor and patient, and remaining silent. [*Id.* at Page ID # 9, ¶ 44.] The artificial distance now required between counselors and patients requires counselors to raise their voices and/or go into Market Street and hover over the vehicles dropping women off in order to try to speak with them. [*Id.* at Page ID # 9, ¶ 45.]

Given the configuration of the buffer zone at EMW and the way it is currently being employed, the real-world effect on Plaintiffs' sidewalk counseling has been far-reaching. The Ordinance has made true sidewalk counseling all but impossible. It has not merely or incidentally burdened Harpring's and Kenney's First Amendment

freedoms. For all practical purposes, the Ordinance has eliminated them. [*Id.* at Page ID # 8-9.]

Moreover, since the adoption of the Ordinance, uncertainties already inherent on its face in its language about what is and is not prohibited have played out in its application. For example, while the words of Section I (B) prohibit non-exempt individuals from even *entering* the zones, Plaintiffs Kenney and Harpring have been told by at least one LMPD officer that they are permitted to walk through the buffer zone to get to the other side. [*Id.* at Page ID # 9, ¶ 46.] Notwithstanding this interpretation from an agent of Metro, on November 9, 2021, Plaintiff Kenney was handed a Written Warning under Section (f) of the Ordinance alleging that she had violated the Ordinance on October 22, 2021. [*Id.* at Page ID # 10, ¶ 47.] According to the Warning, upon review of video footage from that date, the Metro County Attorney concluded that Kenney had violated the Ordinance on that date merely by walking through the buffer zone. [*Id.* at Page ID # 10, ¶ 48.]

Harpring and Kenney filed their lawsuit challenging the Ordinance on November 16, 2021. [*Id.* at Page ID # 1.] They also filed a motion for a preliminary injunction, requesting that the district court enjoin the Ordinance. [PI Motion, RE 37, Page ID # 1540.] The district court denied their motion for a preliminary injunction on February 25, 2022 [PI Order, RE 55, Page ID # 2268], and this timely appeal followed. [Notice of Appeal, RE 57, Page ID # 2299.]

## SUMMARY OF ARGUMENT

The district erred in failing to correctly apply the Supreme Court decision that determines the outcome of this case: *McCullen v. Coakley*. Like the law unanimously struck down in *McCullen*, the Ordinance challenged here carves out a portion of a traditional public forum as a place where core protected speech activities—one-on-one communication and leafletting—are banned. The district court failed to acknowledge *McCullen*'s clear teaching about the level of First Amendment protection afforded to sidewalk counseling in the abortion context, and improperly downplayed the burden imposed by the Ordinance on Harpring's and Kenney's freedoms. Focusing on the size of the buffer zones created by the Ordinance led the court to erroneously relieve Defendant of its burden of demonstrating that the Ordinance is sufficiently narrowly tailored under *McCullen* and other governing case law.

In addition, the district court erred in concluding that the Ordinance survives Plaintiffs' due process challenges based on vagueness, both on its face and as applied by Defendant. Among other things, the district court, in part, erroneously held that its attempted limiting construction saved the Ordinance from Plaintiffs' geographic overinclusiveness argument, ignoring that any such limiting construction would not bind Kentucky state courts.

Finally, the district court erroneously held Plaintiffs did not satisfy the equitable standards for obtaining preliminary injunctive relief in a First Amendment challenge. The law cannot be plainer: when the government restricts the fundamental right to

freedom of speech, the likelihood of success on the merits of a First Amendment claim is the determinative factor in deciding whether a preliminary injunction is proper. An unconstitutional regulation of speech necessarily causes irreparable harm to the speaker whose speech is regulated, and preliminarily enjoining that regulation can never cause substantial harm to the public, as it is always in the public interest for the government to obey the First Amendment.

## STANDARD OF REVIEW

When considering a motion for a preliminary injunction, a district court balances four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction. *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007).

This Court has further refined this test in the First Amendment context: "'the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits. This is so because . . . the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the statute.'" *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007) (quoting *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000)); *see also Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002) ("[W]hen First Amendment rights are implicated, the factors for granting a preliminary injunction essentially collapse into a

determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights.").

This Court reviews a district court's denial of a motion for a preliminary injunction for an abuse of discretion. *E.g., McNeilly v. Land*, 684 F.3d 611, 614 (6th Cir. 2012). This Court will overturn the district court's determination if the district court relied on clearly erroneous factual findings, incorrectly applied the governing law, or used an erroneous legal standard. *Id.* Accordingly, this Court reviews the district court's factual findings for clear error and conducts a *de novo* review of the district court's legal conclusions. *Id.*

# ARGUMENT

## I. Plaintiffs are Likely to Succeed on the Merits of their First Amendment Claim

### A. The Burden is on Metro to Prove Narrow Tailoring.

As an initial matter, while Plaintiffs must demonstrate that they are likely to succeed on the merits of their legal claims to obtain a preliminary injunction, it is nonetheless Metro's burden to prove that the Ordinance comports with the First Amendment. *See, e.g., United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions") (citations omitted); *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 571 (6th Cir. 2012) (governmental entity that enacts content-neutral speech regulation "bears the burden of establishing" that it is narrowly tailored).

In other words, it is not Plaintiffs' duty to show that the Ordinance fails constitutional scrutiny. It is the City's burden to show that the Ordinance satisfies it. If Metro cannot do so—and it cannot—then Plaintiffs are, as a matter of law, likely to succeed on the merits of their constitutional claims against Metro.

The First Amendment scrutiny that Metro's Ordinance must withstand is clear: "[f]or a content-neutral time, place, or manner regulation to be narrowly tailored, it must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)

(quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)). While the speech restriction "need not be the least restrictive or least intrusive means of" serving the government's interests, the government must "not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* (citations omitted).[4]

That standard is no rubber stamp for the government. "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* at 495. *See also Bruni v. City of Pittsburgh*, 824 F.3d 353, 357 (3d Cir. 2016) (*Bruni I*) ("[T]he City cannot burden [speech] without first trying, or at least demonstrating that it has seriously considered, substantially less restrictive alternatives that would achieve the City's legitimate, substantial, and content-neutral interests"); *Reynolds v. Middleton*, 779 F.3d 222, 229 (4th Cir. 2015) (noting that intermediate scrutiny under *McCullen* "require[s] the government to present actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden.").

---

[4] Although Plaintiffs pleaded content and viewpoint discrimination in their Verified Complaint, for purposes of their motion for preliminary injunction and this appeal, they rely exclusively on their claims that the Ordinance is not narrowly tailored under *McCullen*'s intermediate scrutiny analysis and that it is impermissibly vague in violation of the Due Process Clause. They do so without waiving any other claims or arguments.

As demonstrated herein, Metro had ample ways to further its governmental interests of ensuring unobstructed access to healthcare facilities without substantially burdening the speech of law-abiding citizens, including Plaintiffs. Instead of narrowly tailoring its efforts to address those individuals and/or groups causing problems outside EMW (through prosecutions using existing laws, injunctions, legislation that does not regulate speech, etc.), Metro chose the path of least resistance by creating (or authorizing) buffer zones, i.e., no-speech zones for non-exempt persons, at each and every healthcare facility within the city. Under prevailing law, Metro cannot do this. As the Supreme Court has observed:

> The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it. If the sanctions that presently attach to a violation . . . do not provide sufficient deterrence, perhaps those sanctions should be made more severe. But it would be quite remarkable to hold that speech by a law-abid[er] . . . can be suppressed in order to deter conduct by a non-law-abiding third party.

*Bartnicki v. Vopper*, 532 U.S. 514, 529-30 (2001).

The district court erred in its application of decisional law to Plaintiffs' First Amendment free speech claim. It should have ruled that Plaintiffs are likely to succeed on the merits of that claim and entered the preliminary injunction they requested.

## B.  *McCullen* and its Analysis Determines the Outcome of this Case.

The single most relevant case addressing Plaintiffs' First Amendment claim is *McCullen*. In fact, that decision is determinative. Not only did *McCullen* address a challenge to a fixed buffer zone law in the abortion context (as here), brought by

sidewalk counselors (as here), the Ordinance was clearly modeled on the law at issue in *McCullen*.[5]

In *McCullen*, the Supreme Court unanimously struck down a Massachusetts statute that created a 35-foot buffer zone around entrances and driveways of reproductive health care facilities, 573 U.S. at 469-72. That law amended a previous statute that created an 18-foot radius around the entrances and driveways of reproductive facilities, inside of which no one could approach within six feet of another person—unless that person consented—"for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person." *Id.* at 469-70. The law was amended because law enforcement officials had a difficult time enforcing it and the few prosecutions brought under it were unsuccessful. *Id.* at 470. The captain of the Boston Police Department testified that a fixed buffer zone would "make our job so much easier." *Id.*

The amended law was challenged by a group of "sidewalk counselors," who, as the Court pointed out, "are not protestors":

> [Petitioners] seek not merely to express their opposition to abortion, but to inform women of various alternatives and to provide help in pursuing them. Petitioners believe that they can accomplish this objective only through personal, caring, consensual conversations. And for good reason:

---

[5] The irrelevance of the Supreme Court's decision in *Hill v. Colorado*, 530 U.S. 703 (2000), is discussed *infra*, at Sec. I, F. In short, neither *Hill*, nor any other decision of the Supreme Court or lower federal court, is more directly on point to the case at bar than *McCullen*, which, tellingly, chose not to rely on *Hill* in its analysis.

> It is easier to ignore a strained voice or a waving hand than a direct greeting or an outstretched arm.

*Id.* at 489.

The Court in *McCullen* emphasized the special status afforded this type of communication. Stating that the lower court was "wrong to downplay" the burdens on the sidewalk counselors' speech imposed by the Massachusetts buffer zone statute, the Court observed ". . . [w]hile the First Amendment does not guarantee a speaker the right to any particular form of expression, some forms—such as normal conversation and leafletting on a public sidewalk—have historically been more closely associated with the transmission of ideas than others." *Id.* at 488.

The Court held that the Massachusetts buffer zones directly burdened the speech of the sidewalk counselors and negatively impacted their ability to counsel women through the spoken and written word. It held that the zones "compromise[d] petitioners' ability to initiate the close, personal conversations that they view as essential to 'sidewalk counseling,'" and "made it substantially more difficult for petitioners to distribute literature to arriving patients." *Id.* at 487. The Court observed that "[i]f all that the women can see and hear are vociferous opponents of abortion, then the buffer zones have effectively stifled petitioners' message." *Id.* at 489-90.

Despite the substantial burden that the law imposed on the sidewalk counselors' speech, Massachusetts asserted that the buffer zones served the governmental interests of "public safety, patient access to healthcare, and the unobstructed use of public

sidewalks and roadways." *Id.* at 486. The central question before the Court in *McCullen*, however, was not whether the buffer zones served these interests, but whether, in advancing those interests through no-speech zones, the law burdened "substantially more speech than necessary to achieve the Commonwealth's asserted interests." *Id.* at 490. The narrow tailoring requirement, noted the Court, "demand[s] a close fit between ends and means," and "prevents the government from too readily "sacrific[ing] speech for efficiency." *Id.* at 486 (citations omitted).

The Court held that the law failed this rigorous narrow tailoring standard because the state's interests in ensuring public safety, preventing harassment and intimidation, and combating the obstruction of clinic entrances could have all been served with a more narrowly tailored law that directly prohibited these types of conduct. *Id.* at 490. Indeed, the Court pointed out that a provision of the Massachusetts law not challenged by the *McCullen* plaintiffs subjected to criminal punishment "[a]ny person who knowingly obstructs, detains, hinders, impedes or blocks another person's entry to or exit from a reproductive health care facility." *Id.* (A similar provision in Louisville's Ordinance is likewise not being challenged by Plaintiffs. [Ex. A, Ordinance, 3:21-cv-691, RE 1-1, Page ID # 22, § I (B)(1).].)

The Court observed that if existing laws were inadequate, Massachusetts could have enacted legislation similar to the federal Freedom of Access to Clinic Entrances Act of 1994 ("FACE"), 18 U.S.C. § 248, as other states have done. *Id.* FACE was passed by Congress in 1994 "against a backdrop of escalating violence directed toward

reproductive health clinics, their employees, and patients," and was designed to advance the very same interests cited by Metro in this case.

The Court also pointed out that cities within Massachusetts already had laws on the books that prohibit the obstruction of sidewalks, streets, and highways. *Id.* The Court observed that these laws, "in addition to available generic criminal statutes forbidding assault, breach of the peace, trespass, vandalism, and the like," were examples of the state's "failure to look to less intrusive means of addressing its concerns." *Id.*

The Court also observed that laws such as FACE are not just enforceable through criminal prosecutions "but also through public and private civil actions for injunctions and other equitable relief." *Id.* The Court has "previously noted the First Amendment virtues of targeted injunctions as alternatives to broad, prophylactic measures." *Id.* The virtue of injunctive relief is that it "focuses on the precise individuals and the precise conduct causing a particular problem." *Id.* The Court held that "the [Massachusetts] Act, by contrast, categorically excludes non-exempt individuals from the buffer zones, unnecessarily sweeping in innocent individuals and their speech." *Id.*

In response to the various more narrowly tailored alternative means Massachusetts could have adopted to serve its interests, the state had "but one reply: 'We have tried other approaches, but they do not work.'" *Id.* The Court rejected that contention. It noted that the state could not identify *one prosecution* brought under state or local laws for criminal activities outside abortion clinics. *Id.* And while Massachusetts

claimed it had already tried pursuing injunctive relief, the last time such injunctions were obtained was much earlier, in the 1990s. *Id.* In short, the government had "not shown that it seriously undertook to address the problem with less intrusive tools readily available to it." *Id.* Neither did the state demonstrate "that it considered different methods that other jurisdictions have found effective." *Id.*

Responding to the state's assertion that intentional or deliberate obstruction, intimidation, or harassment can be "difficult to prove," *McCullen* affirmed the critical point that ease of enforcement is "not enough to satisfy the First Amendment": "A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency." *Id.* at 495.

Finally, and importantly, *McCullen* emphasized that even if adopting and enforcing conduct-based laws (as opposed to speech-regulating ones) would be "ineffective," the state had "another problem." *Id.* at 493. The record before the Court supporting the state's anti-congestion interests pertained "mainly to one place at one time: the Boston Planned Parenthood clinic on Saturday mornings." *Id.* at 493-4. Nothing in the record revealed that "individuals regularly gather at other clinics, or at other times in Boston, in sufficiently large groups to obstruct access." *Id.* The Court held that "[f]or a problem shown to arise only once a week in one city **at one clinic**, creating 35-foot buffer zones at every clinic across the Commonwealth **is hardly a narrowly tailored solution**." *Id.* (emphasis added).

21

### C.    Metro Failed to use less Intrusive Measures in Addressing Issues at EMW as *McCullen* Requires.

Reading the face of Louisville's buffer zone Ordinance, one might think it was enacted *prior to* the Supreme Court's decision in *McCullen*. Indeed, the Ordinance's recitals read as if they had been cribbed from the (losing) briefs of the Massachusetts Attorney General in *McCullen*. Each of the positions set forth in support of enacting the Ordinance was resoundingly rejected by all nine members of the Supreme Court.

For starters, as did Massachusetts, Louisville's Ordinance sets forth the undisputed importance of patients' access to healthcare facilities and the City's legitimate concern about alleged "willful obstruction" of such access. [Ex. A, Ordinance, 3:21-cv-691, RE 1-1, Page ID # 20.] Then, Louisville, as did Massachusetts, says that there is a history of "obstruction and interference with" access to such facilities. [*Id.*] But there then follows, in a fashion quite similar to Massachusetts, statistics and references to "report logs" and police activity about only one healthcare facility: the EMW abortion clinic. [*Id.* at Page ID # 20-21.] *See McCullen*, 573 U.S. at 493 ("The portions of the record that respondents cite to support the anticongestion interest pertain mainly to one place at one time: the Boston Planned Parenthood clinic on Saturday mornings.").

Throughout the Ordinance's recitals, Louisville misses the same point Massachusetts missed by ascribing the problem the Ordinance purports to address to

the behavior of "protestors."[6] The Ordinance shows no awareness whatsoever of the important distinction the *McCullen* Court went to great lengths to delineate between "protestors" and sidewalk counselors in this same context. *Id.* at 489 ("[Massachusetts] misses the point. Petitioners are not protestors.").

Perhaps of equal significance to what Louisville *does* say on the face of its Ordinance to explain its adoption, is what Louisville does *not* say on the face of its Ordinance. Missing from the Ordinance's recitals is any reference to a single prosecution, arrest, or conviction of anyone for violations of already existing laws prohibiting obstruction, blocking, trespassing, assault, or harassment. [Ex. A, Ordinance, 3:21-cv-691, RE 1-1, Page ID # 20-23.] *See McCullen*, 573 U.S. at 494 ("Although respondents claim that Massachusetts 'tried other laws already on the books,' [citation omitted], they identify not a single prosecution brought under those laws within at least the last 17 years.").

Metro also fails to identify any injunctions it (or any other party) has pursued to address problems at EMW. [Ex. A, Ordinance, 3:21-cv-691, RE 1-1, Page ID # 20-23.] This, despite the *McCullen* Court emphasizing the "broad virtues of targeted injunctions as alternatives to broad, prophylactic measures. Such an injunction 'regulates the activities, and perhaps the speech, of a group,' but only because of the group's past

---

[6] The recitals contain 13 separate references to "protestors" or "protests." There are *zero* references to "sidewalk counselors," despite the *McCullen* Court's clear explanation of the difference. [Ex. A, Ordinance, 3:21-cv-691, RE 1-1, Page ID # 20-26.]

*actions* in the context of a specific dispute between real parties.'" *McCullen*, 573 U.S. at 492 (emphasis added). Further, "injunctive relief focuses on the precise individuals and the precise conduct causing a particular problem." *Id.* By contrast, the Ordinance, like the Massachusetts law, "categorically excludes non-exempt individuals from the buffer zones, unnecessarily sweeping in innocent individuals and their speech." 573 U.S. at 492-93.[7]

When one comes to the Ordinance's sole explanation for its failure to solve its EMW problems through existing laws, Metro practically paraphrases the excuse *flatly rejected* by the *McCullen* Court. The Ordinance states LMPD "indicates that when incidents occur, officers are required to make judgment calls" and that a buffer zone "would eliminate the need for LMPD to make judgement calls on whether enforcing existing laws or ordinances would impede on the protestor's First Amendment rights." [Ex. A, Ordinance, 3:21-cv-691, RE 1-1, Page ID # 22.] In other words, in Louisville, as in Boston, painting lines on the sidewalk to categorically exclude even those legitimately exercising their First Amendment rights, would "make our job easier." *McCullen*, 573 U.S. at 495. But, while "[a] painted line on the sidewalk is easy to enforce, the prime objective of the First Amendment is not efficiency." *Id.* On the Ordinance's face, Metro does not even try to improve upon the justification/excuse put forward by

_____

[7] In addition to existing laws and targeted injunctions, the *McCullen* Court also provided several other less restrictive measures that other jurisdictions have enacted in similar contexts. Louisville's Ordinance fails to mention anything of the kind. [Ex. A, Ordinance, 3:21-cv-691, RE 1-1, Page ID # 20-23.]

Massachusetts and rejected by the Supreme Court. "It's easier for LMPD to enforce this" simply does *not* pass muster under *McCullen*.

Any supposed difficulty in identifying unlawful actions or individuals to prosecute under existing laws or target for injunctions is belied both by the face of the Ordinance itself as well as the Written Warning given to Plaintiff Kenney. [Ex. B, Warning, 3:21-cv-691, RE 1-2, Page ID # 28.] The recitals in the Ordinance contain detailed numbers about protestors present at EMW during specific time periods and cite two separate LMPD memoranda with further details about protestors and their activities. [*Id.* at Page ID # 20-21.] As the *McCullen* Court put it, in response to Massachusetts's assertion of enforcement difficulties, "[i]f Commonwealth officials can compile an extensive record of obstruction and harassment to support their preferred legislation, we do not see why they cannot do the same to support injunctions and prosecutions against those who might deliberately flout the law." *McCullen*, 573 U.S. at 495.

In addition to this facial undermining of any justification arising from an alleged difficulty in enforcing laws against lawbreakers on the sidewalk in front of EMW, we now have the benefit of Plaintiff Kenney's Written Warning to demonstrate just how easy such enforcement is in real life. [Ex. B, Warning, 3:21-cv-691, RE 1-2, Page ID # 28.] That warning indicates that security footage from EMW was forwarded to the Metro County Attorney's Office. The County Attorney reviewed the footage and determined that "a violation of BZO" (buffer zone ordinance) had occurred. Shortly

thereafter, an LMPD officer asked Kenney for her identifying information. She gave it and, days later, was handed the Written Warning. [*Id.*] To paraphrase *McCullen*, if Metro officials can collect video evidence of allegedly unlawful activities taking place at EMW by readily identifiable perpetrators, it is difficult to see why they could not have been doing so all along to support injunctions and prosecutions against the lawbreaking "protestors" whose actions are the purported basis for shutting down a public forum to law-abiding citizens exercising their First Amendment rights.

In support of their motion, Plaintiffs argued that the Ordinance is not narrowly tailored because "the government has failed to show that it has pursued its interests through less restrictive alternatives," such as by seeking prosecutions and/or injunctions against individuals who actually obstruct free passage on sidewalks near clinics. [Memo. ISO PI Motion, RE 37-1, Page ID # 1555-1558; Reply ISO PI Motion, RE 39, Page ID # 1618-1621.] In response, the district court expressly declined to "consider whether a less restrictive alternative is available" [PI Order, RE 55, Page ID # 2284], holding instead that "Metro Government need not pursue less restrictive means in accomplishing its significant interest" because "the Ordinance is narrowly tailored." [*Id.* at Page ID # 2287 (citations omitted).]

This is wrong and ignores *McCullen*'s holding that "[t]o meet the requirement of narrow tailoring, **the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests**, not simply that the chosen route is easier." 573 U.S. at 495 (emphasis added).

*See also id.* at 479 ("[i]n discussing whether the Act is narrowly tailored . . . we identify a number of less-restrictive alternative measures that the Massachusetts Legislature might have adopted"); *id.* at 490 (raising "the concern" that the state had "too readily forgone options that could serve its interests just as well, without substantially burdening the kind of speech in which petitioners wish to engage"); *id.* at 494 (noting that Massachusetts had "not shown that it seriously undertook to address [its interests] with the less intrusive tools readily available to it"). Indeed, the great bulk of the Court's narrow tailoring analysis in *McCullen* is devoted to describing alternatives measures the state might have adopted to further its interests without substantially burdening speech. *Id.* at 486-496.

In holding that Metro was not required to pursue (or even consider) less burdensome means of accomplishing its interests, because the Ordinance is narrowly tailored, the district court put the cart before the horse. *McCullen*, and decisional law applying it, is clear: to determine whether a speech regulation that burdens First Amendment activities is narrowly tailored, the government must "present evidence showing that—before enacting the speech-restricting law—it 'seriously undertook to address the problem with less intrusive tools readily available to it.'" *Billups v. City of Charleston*, 961 F.3d 673, 688 (4th Cir. 2020) (quoting *McCullen*, 573 U.S. at 494); *see also Martin v. City of Albuquerque*, 396 F. Supp. 3d 1008, 1029 (D.N.M. 2019). Again, Louisville failed to do so, and the district court failed to recognize the importance of

Louisville's obligation to support the constitutionality of its Ordinance. The district court's order should be reversed.

### D.     The Ordinance Fails Narrow Tailoring Because of its Geographical Overinclusiveness.

On its face, the Ordinance creates (or authorizes) buffer zones at *all* healthcare facilities in Louisville/Jefferson County Metro. [Ex. A, Ordinance, 3:21-cv-691, RE 1-1, Page ID # 24, § I(B)(2).] "Healthcare facility" is defined so broadly as to, indisputably, cover—at a minimum—dozens and dozens of entities in the Metro region. [*Id.* at Page ID # 23, § I(A).] But all the detailed supporting evidence, statistics, and anecdotes about the problem Metro seeks to address with its Ordinance concern just one healthcare facility: EMW.

The Ordinance can be read in two entirely different ways. (The vagueness of the Ordinance on this point is discussed, *infra*, at Sec. II A.) On the one hand, there is Metro's view, accepted by the district court, that a buffer zone is only enforceable when it is demarcated by the DPW. [PI Order, RE 55, Page ID # 2288.] On the other hand, there is Plaintiffs' view, supported by a plain reading of the Ordinance, that, by virtue of Sec. I (B)(2), buffer zones are now enforceable outside all healthcare facilities, whether lines have been drawn by the DPW or not. [Ex. A, Ordinance, 3:21-cv-691, RE 1-1, Page ID # 22, § I (B)(2)]. Under that reading, the purpose of drawing lines, at the request of a healthcare facility, is simply to aid the police and public by giving them a (literal) bright line.

No matter which interpretation one accepts, the fatal constitutional flaw of lack of narrow tailoring is present. Instead of legislatively dealing with the issues principally outside EMW, the one facility where alleged bad conduct needed to be addressed, Metro has created (or authorized) buffer zones outside the entrance of *every* healthcare facility in the City. The Massachusetts law struck down in *McCullen* applied only, and more narrowly, to "*reproductive* health care facilit[ies]", 573 U.S. at 471 (emphasis added), and yet the Court held that because problems were only to be found at one such facility, to create zones outside *all* clinics in the state "is hardly a narrowly tailored solution." *Id.* at 493.

Courts have held, some in light of *McCullen* itself, that the government cannot regulate speech on a county- or city-wide level when the problem giving rise to the regulation is not a county- or city-wide problem. *See, e.g., Reynolds*, 779 F.3d at 231 ("Given the absence of evidence of a county-wide problem, the county-wide sweep of the Amended Ordinance [banning solicitation within all county roadways] burdens more speech than necessary, just as the statute in *McCullen*—a statewide statute aimed at a problem in one location—burdened more speech than necessary."); *Cutting v. City of Portland*, 802 F.3d 79, 89 (1st Cir. 2015) (citing *McCullen*, 573 U.S. at 493) (holding that a city-wide ban on lingering on median strips was "geographically over-inclusive" because of a lack of evidence of a city-wide problem); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 949 (9th Cir. 2011) ("The Ordinance is also geographically overinclusive. The Ordinance applies citywide to all streets and sidewalks

in the City, yet the City has introduced evidence of traffic problems only with respect to a small number of major streets and medians.")

That is precisely the case here, as it was in *McCullen*. Prophylactically regulating speech in traditional public forums outside all healthcare facilities, without any evidence of problems outside all such facilities, is to wield a cudgel to a problem that requires a scalpel. The Supreme Court has repeatedly held that when it comes to protected speech activity, prophylactic restrictions pose serious constitutional concerns. *See, e.g.*, *NAACP v. Button*, 371 U.S. 415, 438 (1963) ("Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone. . . ."); *accord Riley v. National Fed'n of Blind*, 487 U.S. 781, 801 (1988) (same); *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 637 (1980) (same). The requirement of narrow tailoring "prevents the government from too readily 'sacrific[ing] speech for efficiency'"— precisely what the City has done here with its county-wide approach to problems arising only arising at one location. *McCullen*, 573 U.S. at 486 (citation omitted).[8]

---

[8] The district court held that "the Ordinance is not geographically overbroad; it is narrowly tailored to the problem: a healthcare facility **with the type of problem described in the Ordinance** can request the demarcation of a buffer zone." [PI Order, RE 55, Page ID # 2285 (emphasis added)] That is only partially correct. A healthcare facility **need not** have "the type of problem described in the Ordinance" to request that a buffer zone be marked out. It need only meet the Ordinance's definition of "healthcare facility." As such, a facility can request the demarcation of a buffer zone for any reason at all. [Ex. A, Ordinance, 3:21-cv-691, RE 1-1, Page ID # 24, § I (C) (noting that the DPW "shall" create lines upon request, without specifying any limitations placed on the reason for the request).]

30

### E.    The Ordinance Substantially Burdens Plaintiffs' Speech.

The Ordinance burdens essential and protected First Amendment activity. "While the First Amendment does not guarantee a speaker the right to any particular form of expression, some forms—such as **normal conversation and leafletting on a public sidewalk**—have historically been more closely associated with the transmission of ideas than others." *McCullen*, 573 U.S. at 488 (emphasis added). These activities "lie at the heart of the First Amendment," and "[w]hen the government makes it **more difficult** to engage in these modes of communication, it imposes an **especially significant First Amendment burden**." *Id.* at 489 (citation omitted; emphasis added).

The district court's decision rests upon assumptions about how Plaintiffs could still, hypothetically, effectively exercise their First Amendment rights in a traditional public forum outside the clinic, but these assumptions are squarely contradicted by the evidence. For instance, the district court stated that "Plaintiffs are still [] able to engage in sidewalk counseling outside of EMW *due to the large stretches of sidewalk out front of EMW that remain outside the buffer zone's boundaries.*" [PI Order, RE 55, Page ID # 2284 (emphasis added).] This conclusion was premised upon the incorrect assumption that all, or most, of the women heading to the clinic approach it by walking a significant distance on the sidewalk that is located outside the buffer zone, giving Plaintiffs ample opportunity to engage them in conversation before they enter the clinic. The evidence clearly established, however, that due to the Ordinance, "Plaintiffs can no longer walk alongside patients and try to initiate quiet, personal, caring conversations about abortion

alternatives" because a large percentage of the women heading to the clinic—approximately 75 percent—are dropped off by an EMW agent or other driver *directly in front of the building*, at the curb where the buffer zone begins. [Verified Complaint, 3:21-cv-691, RE 1, Page ID # 8-9, ¶¶ 42-44.] The entirety of the short walk from the curb to the clinic entrance occurs inside the buffer zone. *Id.* During this handful of seconds, clinic escorts on either side of the woman obstruct Plaintiffs from handing pamphlets to her by striking or blocking Plaintiffs' hands and tearing the pamphlets. [*Id.* at Page ID # 8, ¶ 42.] The fact that the Ordinance prohibits Plaintiffs from briefly entering the buffer zone, in an attempt to avoid the escorts' physical assaults and obstruction to try to directly offer their literature to the woman heading to the clinic, further illustrates the Ordinance's far-reaching impact on core First Amendment speech and activities in a public forum.

Contrary to the district court's suggestion, a large percentage of Plaintiffs' intended audience is "now physically beyond Plaintiffs' reach for sidewalk counseling and pamphleteering" because of the Ordinance. [*Id.* at Page ID # 9, ¶ 43.] "Plaintiffs are now forced to either enter the street to try to hand [women] pamphlets and converse with them or hover over the vehicles dropping off women in a manner contrary to Plaintiffs' longstanding and preferred manner of sidewalk counseling." [*Id.* at Page ID # 9, ¶ 44.] That is not a viable alternative. Plaintiff Kenney "has been warned by an LMPD officer that by going into the street and trying to speak with people getting out of their vehicles, she is engaging in 'harassment.'" [*Id.*] In sum, due to the Ordinance,

"Plaintiffs' ability to interact with [women] in a personal, caring, and compassionate way is effectively eliminated." [*Id.*]

The district court asserted that "[t]he only thing Plaintiffs are prevented from doing as a result of the buffer zone placement is physically obstructing a patient from entering the healthcare facility." [PI Order, RE 55, Page ID # 2285.] That is clearly incorrect. The buffer zones prevent Plaintiffs from entering or remaining in the zone in order to engage in "one-on-one communication"—"the most effective, fundamental, and perhaps economical avenue of political discourse." *McCullen*, 573 U.S. at 488 (citation omitted).

Moreover, if the only thing the buffer zone does is prevent Plaintiffs from physically obstructing a patient, there would be no need for any buffer zone at all, as a separate provision of the Ordinance—unchallenged here—already provides, "No person shall knowingly obstruct, detain, hinder, impede, or block another person's entry to or exit from a healthcare facility." [Ex. A, Ordinance, 3:21-cv-691, RE 1-1, Page ID # 22, § I (B)(1).]

The district court stated that "if a person enters EMW by walking through the middle of the buffer zone, Plaintiffs can counsel them from merely five feet away on either side. Thus, Plaintiffs are able to continue their sidewalk counseling at a normal conversational distance." [PI Order, RE 55, at Page ID # 2284-85.] As discussed previously, however, the hypothetical world in which Plaintiffs are able to engage in a quiet, normal, peaceful conversation with a woman approaching the clinic after the

33

Ordinance's enactment does not exist. Additionally, the district court relied upon an inapposite quote from *Hill* suggesting that an eight-foot buffer zone "should not have any adverse impact on the readers' ability to read signs." [*Id.* at Page ID # 2284 (citing 530 U.S. at 726-27). In this case, Plaintiffs are not seeking to hold signs that can be read from a distance; they are seeking a return to the status quo in which they were able to freely use the *entirety* of the sidewalk outside EMW to approach others with literature, and engage in peaceful conversations, as is their right under the First Amendment. Because the Ordinance makes it "more difficult" for Plaintiffs to engage in these constitutionally protected modes of communication, "it imposes an especially significant First Amendment burden." *McCullen*, 573 U.S. at 489. And that burden has caused them irreparable injury. *See Newsom v. Norris,* 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.")

F.    *Hill v. Colorado* **Has as Much Relevance in this Case as it Did in** *McCullen*: **None.**

It cannot seriously be questioned that the Louisville Ordinance is modeled on the law struck down in *McCullen*; not the law upheld in *Hill*. As such, the district court also erred in placing any reliance on *Hill* when it denied Plaintiffs' motion for a preliminary injunction. Even though both *Hill* and *McCullen* considered legislation involving the regulation of speech in the abortion context, *McCullen* nowhere relied

upon, explained, or applied *Hill*.[9] The reason is obvious: the fixed buffer zone in *McCullen*, which imposed a flat ban on speech for all non-exempt speakers (as in the instant action), is different in kind from the floating bubble zone in *Hill*, which allowed speakers to approach listeners **who consented**. (Plaintiffs direct the Court's attention to the amicus brief submitted in this case by the Attorney General for the Commonwealth of Kentucky and its discussion of *Hill*. Doc. 24 at 14-26.)

*Hill* involved an eight-foot *bubble* zone—within a 100-foot buffer zone—that prohibited individuals from knowingly approaching another person within eight feet of that person to pass a leaflet, counsel, or hold a sign unless that person consents. 530 U.S. at 707-8. The Colorado law created an 8-foot restriction on an *unwanted* physical approach to a person accessing a health clinic. *Id.* at 707. The Louisville Ordinance, however, creates an *absolute ban* on non-exempt speech within the boundaries of buffer zones. In other words, and unlike the *buffer* zones created by the Ordinance, Colorado's *bubble* zone could be "pierced," as it were, when the listener consented, or the speaker stood in one place and was approached by the listener. *Id.* at 708 (noting that the Colorado bubble zone did "not require a standing speaker to move away from anyone

---

[9] Contrary to what the district court observes, Plaintiffs did not state *McCullen* does not cite *Hill*. [PI Order, RE 55, Page ID # 2278.] Plaintiffs wrote that "*except to note* that the prior Massachusetts law was modeled after the Colorado statute at issue in *Hill*, *see* 573 U.S. at 471, *McCullen* does not even cite the decision." [Memo. ISO PI Motion, RE 37-1, Page ID # 1560 (emphasis added)]. *McCullen* refers to *Hill* only to convey a statement of fact, and that factual reference does not amount to a citation "with approval," let alone a "conscientious decision not to overturn it." [PI Order, RE 55, Page ID # 2278.]

passing by."). *Hill* repeatedly emphasizes that the Colorado statute only prohibited approaches to unwilling listeners, allowing communications with willing listeners to proceed. *Id.* at 715-16, 718.[10]

In contrast to the operation of the law in *Hill*, Plaintiffs, here, cannot cross into a buffer zone imposed by the Louisville Ordinance to continue speaking one-on-one with a patient or hand that patient a pamphlet, *even if the patient wishes to hear what Plaintiffs have to say or expresses a desire to read Plaintiff's pamphlet*. Moreover, though the Supreme Court suggested that sidewalk counselors in *Hill* "might easily stand on the sidewalk at entrances" to hand out literature, 530 U.S. at 730, Plaintiffs are *not* permitted to do that under the Ordinance, as entrances, including the one at EMW, are at the heart of the no-speech zones.

The barriers created by the Ordinance do not therefore just impact Plaintiffs' rights, they implicate the rights of women visiting the clinic. *Cf. Jobe v. City of Catlettsburg*, 409 F.3d 261, 265 (6th Cir. 2005) (The Supreme Court "has explained that the right to distribute literature protects both the interests of speakers in sharing information and the interests of citizens in receiving it.") (citations omitted).

---

[10] *Hill*'s emphasis on this point contradicts *McCullen*'s observation that "on public streets and sidewalks," "a listener often encounters speech he might otherwise tune out. In light of the First Amendment's purpose 'to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail,' this aspect of traditional public fora is a virtue, not a vice." *McCullen*, 573 U.S. 464 (citation omitted).

In sum, there is an important difference in kind between a categorical ban on all speech by all speakers within fixed zones, as the Ordinance creates, and a ban on uninvited speech within a bubble zone, as in *Hill*. In fact, except with respect to targeted residential picketing focused on a single residence, the Supreme Court has *never* upheld a *legislatively* enacted flat ban on speech as to all speakers in the abortion context. In *Madsen v. Women's Health Center, Inc.*, 512 US 753, 762-63 (1994), a thirty-six foot buffer zone did not apply to all speakers, but only to those subject to a state court injunction. Similarly, the fifteen-foot buffer zone in *Schenck v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357, 362 (1997), applied only to individuals and groups subject to a federal court injunction, not to the general public. In *Hill*, as explained, Colorado did not outright ban all speech within an eight-foot zone, as it allowed sidewalk counselors to speak within that zone when consent was given.

*McCullen* deliberately chose to set aside *Hill* in its analysis of legislation that is remarkably similar to the one challenged here. There was thus no reason for the district court to employ that decision in adjudicating Plaintiffs' claims, and there is no reason for this Court to do so.[11]

---

[11] Granted, only the Supreme Court can overturn *Hill*, and Plaintiffs are not asking this Court to do so. But, in light of *McCullen*'s obvious application to this case—and *Hill*'s irrelevance—the district court should have placed as much weight on *Hill* as the Supreme Court did in *McCullen*: None.

### G.   The District Court's Reliance on Other Buffer Zone Decisions was Misplaced, and the Weight it Placed on the Size of the Ordinance's Buffer Zone was Erroneous.

As for the other cases relied upon by the district court, they do not compel the conclusion that the Ordinance is narrowly tailored. [PI Order, RE 55, Page ID # 2281-2283, 2285.] In *Price v. Chicago*, 915 F.3d 1107 (7th Cir. 2019), the Seventh Circuit upheld Chicago's eight-foot bubble zone because, as that court noted, the ordinance was "materially identical" to the Colorado statute at issue in *Hill. Id.* at 1119. As Plaintiffs have explained, however, the Ordinance is different in kind and operation than the floating bubble zones at issue in *Hill* and thus, *a fortiori*, the ordinance in *Price*.

In *Turco v. Englewood*, 935 F.3d 155 (3d Cir. 2019), the Third Circuit did not uphold the buffer zone ordinance challenged in that case, but simply held that neither side was entitled to summary judgment because issues of material fact remained to be decided. *Id.* at 158.

Finally, in *Bruni v. City of Pittsburgh*, 941 F.3d 73 (3d Cir. 2019), the Third Circuit upheld a buffer zone that barred congregating, patrolling, picketing, and demonstrating within 15 feet of a hospital or healthcare facility. In upholding that zone, however, the court specifically held that *it did not apply to sidewalk counseling. Id.* at 88. The Third Circuit specifically noted that if Pittsburgh wanted to amend its ordinance to restrict "one-on-one conversations"—as Metro's Ordinance does—it would have to satisfy the narrow tailoring demands as articulated in *McCullen. Id.* at 95 n.22.

The district court ultimately (and erroneously) held that Plaintiffs were not likely to succeed on the merits of their First Amendment claim because of the size of the Ordinance's buffer zone and decisional law "upholding buffer zones more narrowly tailored than the one in *McCullen*." [PI Order, RE 55, Page ID # 2285.] It noted that "[s]everal district courts have denied injunctive relief in buffer zone challenges, even when analyzing larger buffer zones than the one created by the Ordinance." [*Id.*]

The district court erroneously placed too much emphasis on the size of the buffer in reaching its conclusion. As the Third Circuit has explained:

> What matters is the burden on speech that such zones impose, of which size is one but only one feature. Indeed, smaller buffer zones are not always better: *McCullen* struck down a thirty-five foot zone even though *Madsen* had previously upheld a slightly larger zone. *McCullen* never referenced the size of the approved zone in *Madsen* or that the Massachusetts zones were actually smaller. Those cases turned on their distinct factual records, not a simple difference in real estate. *McCullen* emphasized the "serious burdens" that the law imposed on speech by "compromis[ing] petitioners' ability to initiate the close, personal conversations that they view as essential to 'sidewalk counseling.'"

*Bruni I*, 824 F.3d at 368 (quoting *McCullen*, 134 S. Ct. at 2535).

Indeed, among the numerous alternatives the *McCullen* Court opined the state could have used to further its interests without substantially burdening speech, one is noticeably absent: *a smaller zone*. In fact, after *McCullen*, Massachusetts itself did not create a smaller buffer zone in light of that decision, but amended its law, modeled on FACE, to prohibit, *inter alia*, a person "who, by force, physical act or threat of force, intentionally injures or intimidates or attempts to injure or intimidate a person who

attempts to access or depart from a reproductive health care facility." Mass. Gen. Laws, ch. 266, § 120E½(d). Massachusetts understood the gravamen of the case it lost unanimously: the constitutionally appropriate remedy to deal with bad actors is to pursue bad actors, not to create a prophylactic measure that sweeps innocent persons— and their constitutionally protected activity—into its reach. Metro should have followed Massachusetts's lead in how it remedied its unconstitutional law, not adopt an equally unconstitutional one.

In short, on its face and as applied to Plaintiffs, the Ordinance is not narrowly tailored under *McCullen* and constitutes an unconstitutional abridgment of the Free Speech Clause of the First Amendment. The district court reversibly erred in concluding otherwise.

## II. The Ordinance is Unconstitutionally Vague.

A further legal error committed by the district court was its ruling that the Ordinance does not violate the Due Process Clause of the Fourteenth Amendment. [PI Order, RE 55, Page ID # 2291.] In the First Amendment context, a vague law is one that:

> denies fair notice of the standard of conduct to which a citizen is held accountable. At the same time an ordinance is void for vagueness if it is an unrestricted delegation of power, which in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and overzealous enforcement.

*Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1183-84 (6th Cir. 1995) (citation omitted).

An ordinance is void for vagueness if it inhibits would-be speakers from speaking

because they cannot tell whether their intended speech falls within the ordinance's prohibitions. *See, e.g.*, *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997) ("The vagueness of [a content-based speech] regulation raises special First Amendment concerns because of its obvious chilling effect on free speech.").

The Ordinance is unconstitutionally vague for at least two reasons: (1) it does not define how or when a buffer zone is enforceable, and (2) it does not address whether Plaintiffs, and those similarly situated, are permitted to cross through a buffer zone to get to the other side. The district court reversibly erred in concluding otherwise.

## A.    When Buffer Zones are Operational.

The Ordinance nowhere explicitly provides how, or when, buffer zones are made operational, i.e., enforceable. While the text of the Ordinance states that buffer zones now exist outside all facilities that fall within the Ordinance's broad definition of "healthcare facility" [Ex. A, Ordinance, 3:21-cv-691, RE 1-1, Page ID # 22, § I (B)(2)], the Ordinance also states that the Department of Public Works shall paint lines marking the existence of the buffer zone at the request of a healthcare facility. [*Id.* at Page ID # 24-25, § I (C).] *Nothing in the Ordinance*, however, links Section I (B)(2) with Section I (C) by providing that buffer zones are only operational after the DPW has painted the boundaries of the buffer zone. In other words, Section I (B)(2) provides that there is a buffer zone regardless of any painted lines.

This missing link of tying together Section I (B)(2) and Section I (C) is in marked contrast to the laws at issue in *McCullen* and *Turco*, which both provide that the buffer

zones "shall only take effect . . . if the area contained within the radius and rectangle [of the zone] is clearly marked and posted." 2000 Mass. Ch. 217; Englewood Code of Ordinances § 307-3.[12] Metro's Ordinance contains no such language, or anything like it. Because the Ordinance does not address how or when buffer zones outside healthcare facilities are enforceable, law enforcement officials are empowered to make this decision on their own, based on whim or fancy, or worse yet, based on the content or viewpoint of speech, such as Plaintiffs' speech. Due process does not permit such unbridled discretion.

As noted in the order denying Plaintiffs' motion for a preliminary injunction, the district court previously, in *Sisters for Life*, provided a limiting construction of the Ordinance in holding that buffer zones are only enforceable when the DPW has marked out the zones with painted lines. [PI Order, RE 55, Page ID # 2289.] The district court's decision in this regard illustrates the vagueness of the Ordinance. *The district court would not have needed to provide a limiting construction of the Ordinance if the language in the Ordinance were clear and not ambiguous.*

Interpreting the Ordinance as the district court did here does not preserve its constitutionality, but raises equal, if not greater, constitutional problems with the Ordinance: it empowers private entities, i.e., healthcare facilities, to suppress free speech

---

[12] Available, respectively, at https://malegislature.gov/Laws/SessionLaws/Acts/2000/Chapter217 and https://ecode360.com/13973387#13973387. (Last visited, March 25, 2022.) In the wake of *McCullen*, as explained, the Massachusetts law was amended to drop its fixed no-speech buffer zone.

42

rights in traditional public forums for any reason at all, untethered from the reason the Ordinance was enacted in the first place. Granting healthcare facilities, however, the unbridled discretion to request the creation of a buffer zone, which the City "shall" create under Section I (C) upon request and without question, allows them to create, willy-nilly, no-speech zones for any reason(s) whatsoever, including for content- or viewpoint-based reasons, or for reasons based on racial, religious, political, or economic animus. A hospital could create a zone to keep protesting employees at bay; a psychiatric hospital could create a zone to silence those protesting negligence or abuse taking place inside; a chemical dependency facility could create a zone because it does not like the ethnicity of those loitering outside. This list goes on.[13]

As the Supreme Court has explained, "the success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance to prevent him from doing so." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 133 n.10 (1992). As *Hill* itself noted, "governmental grants of power to private actors are constitutionally problematic." 530 U.S. at 734 n.43.

---

[13] The district court held that "the Ordinance does not allow suppression of free speech 'for any reason at all.'" [PI Order, RE 55, Page ID # 2288.] But if a healthcare facility can request the city to create a speech-suppressing buffer zone without condition—which the DPW "shall" do upon request—then it necessarily follows that the Ordinance does indeed allow for the suppression of speech for any reason at all.

Because *both* interpretations—whether via Section I (B) or (C)—of how buffer zones are created under the Ordinance cause constitutional problems, the district court's limiting construction cannot save it. As this Court has explained, "[w]hen statutes have a possible constitutional and unconstitutional interpretation, courts are to give them a reasonable interpretation in order to save them from unconstitutionality." *729, Inc. v. Kenton Cty. Fiscal Court*, 515 F.3d 485, 509 (6th Cir. 2008). But "where there are no competing reasonable interpretations" to be had, as here, inserting "language in the statute in order to rewrite it would go beyond [a] Court's role of interpretation." *Id.* (citing *Eubanks v. Wilkinson*, 937 F.2d 1118, 1122 (6th Cir. 1991) ("[T]he general federal rule is that courts do not rewrite statutes to create constitutionality.")). As such, the district court legally erred in re-writing the Ordinance [PI Order, RE 55, Page ID # 2289-91], a re-writing that led it to incorrectly determine that the Ordinance, as written, is not vague and ambiguous.

Furthermore, the limiting construction created by the district court has no bearing on how Kentucky state tribunals interpret the Ordinance. Kentucky courts "are not bound by a federal court's interpretation of state law." *LKS Pizza, Inc. v. Commonwealth*, 169 S.W.3d 46, 49 (Ky. Ct. App. 2005); *see also United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 369 (1971) (noting that while federal courts have the power to give federal statutes an "authoritative construction," "we lack jurisdiction authoritatively to construe state legislation").

Thus, if Plaintiffs, or any other person at all, enters within ten feet of the entrance of a healthcare facility with no painted lines, local police officers will have the unbounded discretion to decide whether a buffer zone is indeed present, and whether a person has violated the terms of the Ordinance. It will not matter to the state trial court, when such a person is prosecuted for violating the Ordinance, that the district court provided a limiting construction. *See Moore v. Sims*, 442 U.S. 415, 428 (1979) (a federal court interpretation of state law is "not binding on state courts and may be discredited at any time").

In sum, because the Ordinance is vague on the central issue of how and when buffer zones are created outside healthcare facilities, it should be struck down and the City made to go back to the legislative drawing board.

## B.     Crossing Through Buffer Zones.

The Ordinance is unconstitutionally vague for a second reason. While the Ordinance provides that one may not enter or remain in a buffer zone (however that zone is created), an exemption is carved out for "[p]ersons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility." [Ex. A, Ordinance, 3:21-cv-691, RE 1-1, Page ID # 24, § I (B)(2)(b).] The problem with this exemption is two-fold. First, it does not address whether Plaintiffs, engaging in sidewalk counseling near EMW, are free to cross through the zone to get to the other side. In other words, if Plaintiff Harpring, for example, is trying to counsel on one side of the zone, can he cross through the zone to

meet a patient approaching the clinic from the other side? His *sole* purpose is not to reach a destination other than EMW; it is to engage in sidewalk counseling with a woman approaching the clinic. On the other hand, what if Plaintiff Harpring wants to walk through the zone to get to the other side so the sun would not be in his eyes? Would that activity fall within the exemption? Does the sole purpose exemption relate solely to location, or does it include what one wishes to do at that location? The Ordinance is not only vague on these questions, it allows law enforcement officials to make on-the-spot decisions without any clear standards. The district court was legally wrong in rejecting these considerations, which underscore the vagueness of the Ordinance. [PI Order, RE 55, Page ID # 2289-90.]

To illustrate the problem with this ambiguous Ordinance, Plaintiff Kenney was at one time informed by an LMPD officer that she was permitted to cross through the zones in order to continue sidewalk counseling on the other side. [Verified Complaint, 3:21-cv-691, RE 1, Page ID # 9, ¶ 46.] And yet, on November 6, 2021, Plaintiff Kenney was issued a formal warning by the City for walking through the buffer zone outside EMW "twice in the span of 20 seconds." [Ex. B, Warning, 3:21-cv-691, RE 1-2, Page ID # 28.] Importantly, that warning was predicated on Plaintiff Kenney's movements alone, without consideration of what her sole purpose might have been.

The right to use public sidewalks for free speech activities is a precious and long-held one. *See, e.g.*, *Schenck* 519 U.S. at 377 ("Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment,

and speech in public is at its most protected on public sidewalks, a prototypical example of a traditional public forum."). The vagueness of the Ordinance as to whether Plaintiffs may use a sidewalk to get to the other side of a buffer zone is therefore no minor issue. Because the exemption is unconstitutionally vague on this question, the provisions of the Ordinance authorizing the creation of buffer zones should be struck down.

## III.   The Equitable Factors Favor a Preliminary Injunction.

The district court incorrectly stated that Plaintiffs failed to address the remaining factors to obtain a preliminary injunction. [PI Order, RE 55, Page ID # 2293-94.] Plaintiffs weaved those arguments throughout their memorandum of law in support of their motion for a preliminary injunction and in their reply brief. Plaintiffs explained that because the Ordinance has violated their Constitutional rights—as they had established a likelihood of success on the merits—they experienced irreparable harm to their First Amendment rights [Memo. ISO PI Motion, RE 37-1, Page ID # 1542, 1549; Reply ISO PI Motion, RE 39, Page ID # 1615], and that the granting of a preliminary injunction would cause no harm to others and would, instead, serve the public interest. [Memo. ISO PI Motion, RE 37-1, Page ID # 1549, 1561, 1567.] Along those lines, Plaintiffs further noted that the Ordinance harms not only Plaintiffs' rights but those of the women visiting the clinic who are not receiving Plaintiffs' full message. [*Id.* at Page ID # 1561.]

As this Court has explained, "when First Amendment rights are implicated, (as in the instant case) the factors for granting a preliminary injunction essentially collapse

into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights." *See Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002). In other words, in a First Amendment case, such as the one at hand, this Court has refined the normal test to obtain a preliminary injunction by explaining that "'the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits. This is so because . . . the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the statute.'" *Hamilton's Bogarts, Inc.*, 501 F.3d at 649 (citation omitted). In light of this Court's case law, Plaintiffs focused the bulk of their arguments on their likelihood of success on the merits, which they established.

Moreover, the district court's assertion that it was uncontested that an injunction would risk such harm to patients as harassment [PI Order, RE 55, Page ID # 2294], is incorrect. Plaintiffs repeatedly argued, consistent with the evidence, that Louisville has numerous means at its disposal to address any actual obstruction or harassment, for example, through prosecutions and targeted injunctions. [Memo. ISO PI Motion, RE 37-1, Page ID # 1555-58; Reply ISO PI Motion, RE 39, Page ID # 1618-21.] The availability of these law enforcement tools negates Louisville's claim that an injunction would substantially harm others and be contrary to the public interest. No doubt, Plaintiffs' exercise of their constitutionally protected expression can never harm Louisville's legitimate interests. Any legitimate interest asserted by Louisville would remain fully protected by existing provisions of State and local law.

In sum, there is no legitimate or compelling governmental interest that is furthered by the unconstitutional application of an Ordinance against any citizens since (1) where "the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere its enjoinment," and (2) "it is always in the public interest to prevent the violation of a party's constitutional rights." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 400 (6th Cir. 2001) (citation omitted); *accord ACLU Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 649 (6th Cir. 2015).[14]

Granting a preliminary injunction here will ensure that Plaintiffs will remain free to communicate their message peacefully. At the same time, Louisville's legitimate interests will remain fully protected by existing law and the public interest will not be harmed.

---

[14] Remarkably, the district court ignored Metro's plainly viewpoint-based argument that if the district court granted Plaintiffs a preliminary injunction, it would empower "Plaintiffs and protestors, *specifically right-wing protestors*," to flout the law. [Memo. Opp. PI Motion, RE 39, Page ID # 1592 (emphasis added).] Viewpoint-based discrimination is an "egregious form of content discrimination," *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995), and is "prohibited," no matter the forum at issue. *Pleasant Grove City v. Summum*, 555 U.S. 460, 461 (2009). The court below should have—at a minimum—admonished Metro for making such an argument.

## CONCLUSION

Plaintiffs-Appellants Edward Harpring and Mary Kenney respectfully request that this Court reverse the district court's denial of their motion for a preliminary injunction and enter a preliminary injunction while the case proceeds to the merits in the district court.

Respectfully submitted,

/s/ Francis J. Manion

EDWARD L. WHITE III
ERIK M. ZIMMERMAN*
AMERICAN CENTER FOR LAW
  & JUSTICE
3001 Plymouth Road, Suite 203
Ann Arbor, Michigan 48105
Tel.: 734-680-8007
Email: ewhite@aclj.org

*not admitted in this jurisdiction

Dated: April 11, 2022

FRANCIS J. MANION
GEOFFREY R. SURTEES
AMERICAN CENTER FOR LAW
  & JUSTICE
Post Office Box 60
New Hope, Kentucky 40052
Tel.: 502-549-7020
Email: fmanion@aclj.org

*Counsel for Plaintiffs-Appellants
Edward Harpring and Mary Kenney*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 12,872, which does not exceed the maximum of 13,000 words allowed, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b). I further certify that the attached brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Garamond font.

/s/ Francis J. Manion
FRANCIS J. MANION
AMERICAN CENTER FOR LAW
  & JUSTICE
Post Office Box 60
New Hope, Kentucky 40052
Tel.: 502-549-7020
Email: fmanion@aclj.org

*Counsel for Plaintiffs-Appellants*
*Harpring and Kenney*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was electronically filed with the Clerk of Court for the United States Court of Appeals for the Sixth Circuit on April 11, 2022, using CM/ECF. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

/s/ Francis J. Manion
FRANCIS J. MANION
AMERICAN CENTER FOR LAW
  & JUSTICE
Post Office Box 60
New Hope, Kentucky 40052
Tel.: 502-549-7020
Email: fmanion@aclj.org

*Counsel for Plaintiffs-Appellants*
*Harpring and Kenney*

# DESIGNATION OF COURT DOCUMENTS

*Sisters for Life, Inc. et al. v. Louisville-Jefferson County Metro Government, et al.*, No. 3:21-cv-367-RGJ (lead case number), 3:21-cv-691-RGJ

| Record Entry No. | Description | Page ID # |
|---|---|---|
| 1  (691)[15] | Verified Complaint | 1-18 |
| 1-1 (691) | Ex. A, Louisville Ordinance O-179-21 | 19-26 |
| 1-2 (691) | Ex. B, Louisville Police Warning to Kenney | 27-28 |
| 37 | Motion for Preliminary Injunction | 1540-41 |
| 37-1 | Memorandum ISO Motion for Preliminary Injunction | 1542-67 |
| 37-2 | Proposed Order Granting Preliminary Injunction | 1568-72 |
| 38 | Opposition to Motion for Preliminary Injunction | 1573-94 |
| 38-1 | Ex. A, NAF Report | 1595-97 |
| 38-2 | Ex. B, Video Link | 1598 |
| 38-3 | Ex. C, Ohio Policy Evaluation Network | 1599-1602 |
| 38-4 | Ex. D, Margorie Fitzgerald Transcript | 1603 |
| 38-5 | Ex. E, Louisville Police Memorandum | 1604-06 |
| 38-6 | Ex. F, Louisville Ordinance § 132.09 | 1607-08 |
| 38-7 | Ex. G, Photograph | 1609 |
| 38-8 | Ex. H, Englewood Ordinance § 307-3 | 1610-11 |
| 38-9 | Proposed Order Denying Preliminary Injunction | 1612-13 |
| 39 | Reply ISO Motion for Preliminary Injunction | 1614-29 |
| 55 | Memorandum Opinion and Order Denying Preliminary Injunction | 2268-96 |
| 57 | Notice of Appeal | 2299-2300 |

---

[15] Harpring and Kenney's initial docket entries appear in Case No. 3:21-cv-691. Their case was later consolidated with Case No. 3:21-cv-367, and their remaining docket entries appear in that case. As such, the first three docket entries above include (691) next to the docket entry to indicate their location in Case No. 3:21-cv-691. The remaining docket entries above are located in Case No. 3:21-cv-367.

# ADDENDUM

**Page**

Louisville Ordinance O-179-21.........................................................................Add. 1

ORDINANCE NO. *065*, SERIES 2021

**AN ORDINANCE AMENDING THE LOUISVILLE/JEFFERSON COUNTY METRO CODE OF ORDINANCES TO ENSURE SAFE, UNOBSTRUCTED ENTRY TO AND EXIT FROM A HEALTHCARE FACILITY (AMENDMENT BY SUBSTITUTION)(AS AMENDED).**

**SPONSORED BY: COUNCIL MEMBERS CHAMBERS ARMSTRONG, ARTHUR, HOLLANDER, AND JAMES**

**WHEREAS,** the Louisville Metro Council recognizes that unimpeded access to healthcare facilities for the purpose of obtaining medical counseling and treatment is imperative to the safety and well-being of this city and community;

**WHEREAS,** preventing the willful obstruction of a person's access to medical counseling and treatment at a healthcare facility is a matter of city-wide concern;

**WHEREAS,** there is a documented history of obstruction of and interference with people's access to healthcare facilities in Louisville;

**WHEREAS,** between January 2021 through March 2021, there has been a total of at least 1,447 reported protestors outside of the EMW Women's Surgical Center ("EMW Clinic") with about 23 protestors on any given day;

**WHEREAS,** report logs for the EMW Clinic indicate a regular pattern of obstruction, trespassing, assault and stalking;

**WHEREAS,** report logs for the EMW Clinic indicate that the police were called on multiple occasions for the assault and stalking of patients;

**WHEREAS,** a study of nine (9) reproductive health clinics in Ohio, Kentucky and West Virginia conducted by the Ohio Policy Evaluation Network (OPEN) found that more than fifty (50) percent of patients from the EMW clinic reported protestors as a challenge to receiving healthcare; this is 3 times the average for the other eight (8) clinics combined;

1

**Add. 1**

**WHEREAS,** a memorandum from the Louisville Metro Police Department ("LMPD") indicates that on April 3, 2021, multiple protest groups from out of town were present outside of the EMW Clinic; *See* LMPD Memorandum from April 5, 2021;

**WHEREAS,** the memorandum states while local protestors could be differentiated from out of town protestors, the out of town protestors were "causing issues;" *Id.*

**WHEREAS,** the memorandum also summarized various instance when LMPD had to be involved in not only preventing the obstruction of the sidewalks, but also the prevention of stalking and touching patients; *Id.*

**WHEREAS**, the EMW Clinic is one of two licensed abortion clinics in Kentucky, thus is likely to consistently have presence from out of town protestors;

**WHEREAS**, a memorandum provided by the LMPD indicates that when incidents occur, officers are required to make judgement calls on whether enforcing ordinances or laws would violate the protestor's First Amendment rights; *See* LMPD Memorandum dated March 24, 2021;

**WHEREAS,** the EMW Clinic may be the most public healthcare facility in need of a safety zone, but at least eight (8) other healthcare providers have expressed support and the need for safety zone legislation; *See* Letters of Support;

**WHEREAS,** the Louisville Metro Council ("Council") values the constitutional rights of free speech and freedom of religion guaranteed by the First Amendment, takes these rights very seriously, and understands the importance of these rights to all people;

**WHEREAS,** because Council recognizes the importance of these constitutional rights, it is imperative that these rights not be impeded while ensuring the safety of those attempting to receive healthcare;

**Add. 2**

WHEREAS, courts across the United States, including the United States Supreme Court, have held that buffer zones between eight (8) and fifteen (15) feet outside of healthcare facilities do not impede on the rights of protestors;

WHEREAS, the United States Supreme Court held that "[p]ersons who are attempting to enter health care facilities—for any purpose—are often in particularly vulnerable physical and emotional conditions;" and small buffer zones respond to this "substantial and legitimate interest in protecting these persons from unwanted encounters, confrontations, and even assaults by enacting an exceedingly modest restriction on the speakers' ability to approach;" *Hill v. Colorado*, 530 U.S. 703, 730 (2000).

WHEREAS, federal courts have held that a ten (10) foot safety zone does not impede a protestor's constitutional rights;

WHEREAS, the creation of a ten (10) foot safety zone would eliminate the need for LMPD to make judgement calls on whether enforcing existing laws or ordinances would impede on the protestor's First Amendment rights;

WHEREAS, the creation of a ten (10) foot safety zone would protect patients entering or leaving health care facilities;

WHEREAS, the creation of a ten (10) foot safety zone would assist in preventing violence against healthcare patients rather than reacting to violence after it has occurred; and

WHEREAS, Council declares that legislation creating a ten (10) foot safety zone is narrowly tailored to serve its interest in protecting patients entering and leaving

healthcare facilities as well as its interest in protecting protestors' constitutional right to free speech.

**NOW, THEREFORE, BE IT ORDAINED BY THE LEGISLATIVE COUNCIL OF THE LOUISVILLE/JEFFERSON COUNTY METRO GOVERNMENT AS FOLLOWS:**

**SECTION I:** A new subchapter of the Louisville Metro Code of Ordinances, 132.09, is hereby enacted as follows:

(A) *Definitions.* For the purpose of this chapter, the following definitions shall apply unless the context clearly indicates or requires a different meaning.

*Driveway* means an entry from a public street to a public or private parking area used by a healthcare facility.

*Entrance* means any door to a healthcare facility that directly abuts the public sidewalk; provided, however, that if the door does not directly about the public sidewalk, the "entrance" shall be the point at which the public sidewalk intersects with a pathway leading to the door.

*Healthcare facility* shall have the same definition as used in Ky. Rev. Stat. Ann. § 216B.015(1) and (13), as any institution, place, building, agency, or portion thereof, public or private, whether organized for profit or not, used, operated, or designed to provide medical diagnosis, treatment, nursing, rehabilitative, or preventive care and includes alcohol abuse, drug abuse, and mental health services. This shall include but shall not be limited to health facilities and health services commonly referred to as hospitals, psychiatric hospitals, physical rehabilitation hospitals, chemical dependency programs, nursing facilities, nursing homes, personal care homes, intermediate care facilities, family care homes, outpatient clinics, ambulatory care facilities, ambulatory surgical centers, emergency care centers and services, ambulance providers, hospices, community

4

**Add. 4**

mental health centers, home health agencies, kidney disease treatment centers and freestanding hemodialysis units, any place in which an abortion is performed, and others providing similarly organized services regardless of nomenclature; and shall include but not be limited to the buildings, grounds and driveways of each such facilities and parking lots in which each such facility has an ownership or leasehold interest.

(B) *Access to a healthcare facility.*

(1) No person shall knowingly obstruct, detain, hinder, impede, or block another person's entry to or exit from a healthcare facility.

(2) No person shall knowingly enter, remain on, or create any obstruction within the driveway of a healthcare facility or within a "buffer zone" on the public way or sidewalk extending from the entrance of a healthcare facility to the closest adjacent sidewalk curb and 10 feet from side to side, during the facility's posted business hours, except:

(a)    persons entering or leaving such facility;

(b)    persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility; or

(c)    law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; or

(d)    employees or agents of such facility acting within the scope of their employment.

(C) *Signage.* The Department of Public Works shall, at the request of a healthcare facility, paint or lay on the public way or sidewalk two easily-distinguishable demarcation lines running from either side of the facility entrance to the closest adjacent sidewalk curb

and extending 10 feet from each other. Healthcare facilities shall post such zone with signage stating: "Healthcare facility: No standing within this zone. [Metro Ordinance]."

(D) *Reporting.* Within two (2) years of the enactment of the ordinance, but no sooner than eighteen (18) months after the enactment of the ordinance, the Louisville Department of Public Health and Wellness shall solicit information from any health care facility that requested the demarcation line as described in this section regarding the efficacy of the "buffer" zone in allowing patients and staff to enter and exit the facility safely, and shall prepare and submit to the Metro Council a report summarizing that information.

(E) *Monitoring and Documentation.* Any health care facility that requests that the Louisville Department of Public Works paint or lay demarcation lines as described in Section 1(C), shall monitor during its hours of operation the "buffer" zone created by the demarcation lines for obstructions created by individuals or groups to allow patients and/or staff to enter and exit the facility safely. In addition, the healthcare facility shall make a good faith effort to regularly document instances where individuals or groups create an obstruction in the driveway or the "buffer" zone and instances when anyone other than those allowed by the ordinance are otherwise present in the "buffer" zone. Such documentation shall be provided to the Louisville Department of Public Health and Wellness, Louisville Department of Public Works, and LMPD every six (6) months, beginning six (6) months after the effective date of this ordinance.

(D̶E̲) *Penalties.*

(1) Prior to issuing a citation for a violation of this section, a police officer or any law enforcement officer shall issue one written warning to an individual. If the individual fails

6

**Add. 6**

to comply after one warning, such individual shall be given a citation. Failure to comply after one warning shall be cause for citation whether or not the failure or subsequent failures are contemporaneous in time with the initial warning.

(2) Any person violating any of the provisions of this Ordinance shall for each such violation, upon conviction thereof, be subject to a fine of no less than one hundred and fifty dollars ($150) and not more than five hundred dollars ($500). If any individual is convicted for a second violation of this Ordinance within one year of a previous conviction under this Ordinance, that individual shall be subject to a fine of no less than two hundred and fifty dollars ($250) and not more than five hundred dollars ($500).

(~~E~~G) *Severability.* The provisions of this section are severable. If any provision of this ordinance is declared invalid, that invalidity shall not affect other provisions of the ordinance which can be given effect without the invalid provision.

**SECTION II:** This Ordinance shall take effect upon its passage and approval.

Sonya Harward
Metro Council Clerk

David James                                    PRO - TEM
President of the Council

Greg Fischer
Mayor

6/02/2021
Approval Date

**APPROVED AS TO FORM AND LEGALITY:**
Michael J. O'Connell
Jefferson County Attorney

BY:

O-179-21 CABS 042821 Safety Zone for Healthcare Facilities.docx

LOUISVILLE METRO COUNCIL
READ AND PASSED
May 20, 2021

7

**Add. 7**