No. 22-5151

## IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

SISTERS FOR LIFE, INC.; ANGELA MINTER;
KENTUCKY RIGHT TO LIFE ASSOCIATION, INC. (**22-5150**),
EDWARD HARPRING; MARY KENNEY (**22-5151**),
*Plaintiffs-Appellants,*

v.

LOUISVILLE-JEFFERSON COUNTY, KY METRO GOVERNMENT, GREG
FISCHER, Mayor; ERIKA SHIELDS, Chief of Police, Louisville Metro Police
Department; MIKE O'CONNELL,
*Defendants-Appellees*

Appeal from the United States District Court for the
Western District of Kentucky, Case Nos. 3:21-cv-367, 3:21-cv-691

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS
## EDWARD HARPRING AND MARY KENNEY

EDWARD L. WHITE III
ERIK M. ZIMMERMAN*
AMERICAN CENTER FOR LAW
  & JUSTICE
3001 Plymouth Road, Suite 203
Ann Arbor, Michigan 48105
Tel.: 734-680-8007
Email: ewhite@aclj.org

*not admitted in this jurisdiction

May 23, 2022

FRANCIS J. MANION
GEOFFREY R. SURTEES
AMERICAN CENTER FOR LAW
  & JUSTICE
Post Office Box 60
New Hope, Kentucky 40052
Tel.: 502-549-7020
Email: fmanion@aclj.org

*Counsel for Harpring and Kenney*

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................i

TABLE OF AUTHORITIES........................................................................................ii

INTRODUCTION .....................................................................................................1

ARGUMENT ............................................................................................................1

I.     The Ordinance Substantially Burdens Harpring and Kenney's Speech................1

II.    The Ordinance is Not Narrowly Tailored Under *McCullen* or *Hill*........................6

    A.     *McCullen v. Coakley*..............................................................................7

    B.     *Hill v. Colorado* ...................................................................................14

III.   The Ordinance Violates Due Process .........................................................17

    A.     When and How Zones are Operational .........................................17

    B.     Crossing Through the Zones .......................................................19

IV.    Plaintiffs Suffer Irreparable Injury ..........................................................21

V.     Remaining Preliminary Injunction Factors Favor Plaintiffs ................................23

CONCLUSION ........................................................................................................24

CERTIFICATE OF COMPLIANCE..............................................................................26

CERTIFICATE OF SERVICE......................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Bible Believers v. Wayne Cty.*,
805 F.3d 228 (6th Cir. 2015) ..................................................... 2, 11-12, 22

*Boos v. Barry*,
485 U.S. 312 (1988) .................................................................... 21, 22

*Bruni v. City of Pittsburgh*,
824 F.3d 353 (3d Cir. 2016) ............................................................8

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*,
511 F.3d 535 (6th Cir. 2007) ........................................................ 23

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
212 L. Ed. 2d 418 (U.S. 2022) ...................................................... 17

*Connection Distrib. Co. v. Reno*,
154 F.3d 281 (6th Cir. 1998) ........................................................ 23

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*,
274 F.3d 377 (6th Cir. 2001) ......................................................23-24

*Forsyth County v. Nationalist Movement*,
505 U.S. 123 (1992) .................................................................... 18, 22

*Frisby v. Schultz*,
487 U.S. 474, 485 (1988) ............................................................. 14

*Gerber v. Herskovitz*,
14 F.4th 500 (6th Cir. 2021) ........................................................21-22

*Hill v. Colorado*,
530 U.S. 703 (2000) .................................................................... *passim*

*Jobe v. City of Catlettsburg*,
409 F.3d 261 (6th Cir. 2005) ............................................................9

*Libertarian Party of Ohio v. Husted*,
    751 F.3d 403 (6th Cir. 2014) ................................................................... 23

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (2001) ...............................................................................6

*Madsen v. Women's Health Center, Inc.*,
    512 US 753 (1994) .................................................................................8

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ..................................................................... *passim*

*Mich. Catholic Conference v. Burwell*,
    755 F.3d 372, 398 (6th Cir. 2014) ....................................................22-23

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) ........................................................................ 12

*Schenck v. Pro-Choice Network of Western N.Y.*,
    519 U.S. 357 (1997) ...............................................................................7

*Schneider v. State*,
    308 U.S. 147 (1939) ....................................................................... 10, 11

*Stanley v. Georgia*,
    394 U.S. 557 (1969) ........................................................................ 5, 17

*Turco v. Englewood*,
    935 F.3d 155 (3d Cir. 2019) ................................................................ 18

## Statutes and Ordianances

Louisville Ordinance O-179-21 .................................................................. *passim*

## INTRODUCTION

The opposition brief of Appellee-Defendant, Louisville-Jefferson County, KY Metro Government ("Metro" or "the City") fails to demonstrate how Metro's Ordinance O-179-21 satisfies the demands of narrow tailoring as articulated in *McCullen v. Coakley*, 573 U.S. 464 (2014). In arguing that the Ordinance provides a bright-line prophylactic rule that is easier to enforce, the City shows that it has failed to comprehend, much less apply, *McCullen*'s core teaching. Moreover, the City has failed to demonstrate that alternative measures that burden substantially less speech would fail to achieve the City's interests. *Id.* at 495. Metro has also failed to respond, in any meaningful way, to Plaintiffs' due process claims against the Ordinance. In fact, the City has compounded the vagueness issue even more so.

## ARGUMENT

### I.     The Ordinance Substantially Burdens Harpring and Kenney's Speech.

The City argues that "Appellants allege an absolute right to minister in a patient's face up to them entering a healthcare facility. This right does not exist and any burden on Plaintiff's speech is very minimal." Metro Br. at 11. Not true.

First, Harpring and Kenney do not allege an **absolute** right to free speech. Rather, Harpring and Kenney allege the well-established constitutional right to engage in "normal conversation and leafletting," which the Supreme Court has held is "more closely associated with the transmission of ideas than others." *McCullen*, 573 U.S. at 488. In addition, they wish to engage in these activities on a public sidewalk. Such public

rights of way "occupy 'a special position in terms of First Amendment protection' because of their historic role as sites for discussion and debate." *Id.* at 476 (quoting *United States v. Grace*, 461 U.S. 171, 180 (1983)). In such forums, like all traditional public forums, "the government's rights to 'limit expressive activity are sharply circumscribed.'" *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 246–47 (6th Cir. 2015) (en banc) (citation omitted). Metro stumbles at the starting gate by mischaracterizing Plaintiffs' free speech claim.

Second, if Harpring and Kenney wished to counsel women through signs or bullhorns, which can be read and heard from outside the buffer zone, the City's assertion about the "minimal" burden imposed on Plaintiffs might have some force. But Harpring and Kenney do not wish to counsel women about alternatives to abortion through these means. Instead, like the sidewalk counselors in *McCullen*, they wish to engage in "personal, caring, consensual conversations with women about various alternatives." *McCullen*, 573 U.S. at 489. Such "close, personal conversations," *id.* at 487, cannot effectually be achieved through a sign or a bullhorn. "[O]ne-on-one communication" is "the most effective, fundamental, and perhaps economical avenue of political discourse." *Id.* at 488 (citation omitted). In other words, the right to engage in quiet verbal speech and pamphleteering on a public sidewalk is a quintessential First Amendment liberty.

Metro's assertion that the Ordinance does not impede Plaintiffs' ability to talk to patients on the public sidewalk "until the last one to two feet from the entrance door,"

Metro Br. at 10, is directly contrary to the record. Metro fails to refute that the zone imposed by the Ordinance imposes a direct and substantial burden on Harpring and Kenney's speech.

Harpring testified that if he is walking with a patient heading towards the front doors of EMW, that conversation prematurely comes to an end when he gets to the painted line, even if the woman is responding to what he has to say. [Harpring Depo., RE 45, PageID#1892–93.] This makes an enormous difference in Harpring's ability to converse with women outside EMW. Harpring testified that, prior to the Ordinance, women who changed their minds about abortion have told him "that the last thing [Harpring] said when [he] was right at the entrance of the doorway" were "the words she actually heard"—words like "God loves you and your baby, or you don't have to do this ma'am; we can help you next door." [*Id.*]

With the buffer zone now in place, however, Harpring can no longer offer those last words before a woman makes the final choice to enter the clinic. Instead, he must "elevate" his voice to continue the conversation "so that quiet conversation becomes more of a louder voice and not as welcoming as it would have been if I had got to continue on to the door with her." [*Id.* at PageID#1893.]

Additionally, Kenney testified about a concrete example of how the buffer zone burdens her ability to engage in quiet conversations with patients. She was speaking with a patient while that patient was walking to the clinic.

> . . . [W]hen we got to the buffer zone, she was very much confused because – this was after I had received my citation – and I felt like I couldn't walk into that buffer zone, so I walked out into the middle of the street. We had been talking about walking down to BSIDEU, the resource center, for her to get an ultrasound.
>
> When she approached the buffer zone and I had to walk out toward the street, she was confused. She didn't know where I went, because at that point she was surrounded by escorts, and then she was ushered into the abortion clinic, so I wasn't able to continue my conversation with her and continue on to BSIDEU . . . as I believe she was interested in doing.

[Kenney Depo., RE 46, PageID#1892–93.]

In addition, the City's photograph [Metro Br. at 10; RE 38, PageID#1609] captures exactly what Plaintiffs described in their verified complaint. Since patients are often dropped off directly in front of the building, at the edge of the portion of the sidewalk that is within the buffer zone, and then surrounded by "escorts" as they enter EMW, Plaintiffs cannot effectively try to place a pamphlet in a patient's hands or try to engage in "personal, caring, consensual conversations." [Verified Complaint, 3:21-cv-691, RE 1, PageID#4, ¶¶ 43–45.].

Moreover, the "video evidence" relied on by the City [Metro Br. at 10; RE 38, PageID#1598], which reveals a taste of the boisterous activity engaged in by some protestors outside EMW, shows how Plaintiffs' mode of quiet communication risks being drowned out entirely. The City's Rule 30(b)(6) representative, Lt. Caleb Stewart, acknowledged that it's difficult to have "a soft, intimate conversation" when someone is using a loudspeaker in the background. [Stewart Depo., RE 47, PageID#2006.] As observed in *McCullen*: "If all that the women can see and hear are vociferous opponents

4

of abortion, then the buffer zones have effectively stifled [the sidewalk counselors'] message." 573 U.S. at 489–90.

Even under the law challenged in *Hill v. Colorado*, 530 U.S. 703 (2000), which the City claims supports the Ordinance, Harpring and Kenney could stand in place outside the very front doors of EMW and, without physically approaching them, hand patients literature and try to engage them in conversation. *Id.* at 730. They cannot do so under the Ordinance, which, by operation of the buffer zone at EMW, pushes them out of that zone, leaving only patients and escorts of EMW (and other exempt speakers) with the privilege to be there. Depriving Plaintiffs of that portion of the public sidewalk deprives them of their ability to offer a final word (verbal or written) to the women Plaintiffs wish to counsel—the exact place where Harpring testified *many women have changed their mind upon hearing his words*. [*See also* 3:21-cv-00691, Verified Complaint, RE 1, PageID#51 (averring that Harpring has "succeeded in persuading women to choose alternatives to abortion in the last few feet before they enter the clinic.").] As such, the Ordinance also burdens the First Amendment rights of the individuals who would be interested in conversing with Plaintiffs, or reviewing their literature, but for the Ordinance's interference with Plaintiffs' expression. *See, e.g.*, *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (citations omitted) ("[The constitutional] right to receive information and ideas, regardless of their social worth . . . is fundamental to our free society.").

As Justice Scalia observed in *Hill*:

> For those who share an abiding moral or religious conviction … that abortion is the taking of a human life, there is no option but to persuade women, one by one, not to make that choice. And as a general matter, the most effective place, if not the only place, where that persuasion can occur, is outside the entrances to abortion facilities.

*Hill*, 530 U.S. at 763 (Scalia, J., dissenting). The fact that Harpring and Kenney are still able to counsel *some* women with the buffer zone in place does not change the fact that the zone substantially burdens their speech. Even under the 35-foot buffer zone in *McCullen*, where the Court held that the law burdened the speech of sidewalk counselors, Eleanor McCullen was still able to persuade "about 80 women not to terminate their pregnancies." *McCullen*, 573 U.S. at 487. In sum, and contrary to the City's position, "[i]t is . . . no answer to say that [sidewalk counselors] can still be seen and heard by women within the buffer zones." *Id.* at 466.

*McCullen* is clear: when the government makes it "more difficult" to hand out leaflets and engage in one-to-one communication, "it imposes an especially significant First Amendment burden." *Id.* at 489. Plaintiffs' mode of communicating with EMW patients has been significantly hampered, and that burden is hardly "minimal," as the City claims. Even still, as the Supreme Court has observed, "there is no 'de minimis' exception for a speech restriction that lacks narrow tailoring." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 567 (2001).

## II.     The Ordinance is not Narrowly Tailored under *McCullen* or *Hill*.

Metro maintains that, whether analyzed under *McCullen* or *Hill*, the Ordinance satisfies the demands of narrow tailoring. Metro is wrong.

**A.** *McCullen v. Coakley*

The City tries to distinguish *McCullen* on at least two grounds: (1) "The record in *McCullen* shows that sidewalk counselors were not affected by the small buffer zone created by the 2000 law," Metro Br. at 17, and (2) while the Ordinance creates a 10-foot buffer zone, the law in *McCullen* created a larger, 35-foot zone. *Id.* Both grounds are unavailing.

First, it is speculation to say that the petitioners in *McCullen* were not impacted by the prior 2000 law which created an 18-foot radius around the entrances and driveways of abortion clinics. *McCullen*, 573 U.S. at 470. Just because the amended 35-foot law may have created a **greater** burden on petitioners' ability to sidewalk counsel does not mean the 18-foot zone imposed **no burden at all**. In fact, *McCullen* itself notes that the prior law was challenged on First Amendment grounds, but was sustained by the First Circuit, relying on *Hill*, which the prior law was modeled upon. *Id.* The City's statement that the petitioners in *McCullen* were just fine with the prior law is pure speculation, and irrelevant at that.

Second, comparing sizes of buffer zones from different cases to try and determine what is a constitutionally appropriate one is an analysis notably avoided by the Supreme Court in *McCullen*. That case did not hold Massachusetts's buffer zone law was unconstitutional simply because it was larger than the eight-foot bubble zone in *Hill* or the fifteen-foot zone in *Schenck v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357, 362 (1997). *McCullen* struck down the law because Massachusetts had "not shown

that it seriously undertook to address the problem with less intrusive tools readily available to it." 573 U.S. at 494.

If comparing sizes of zones was the only factor to consider, *McCullen* would have **upheld** the Massachusetts law because it authorized zones one foot smaller than the thirty-six-foot buffer zone upheld in *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 762–63 (1994). In fact, the Court in *McCullen* nowhere analyzed or relied upon the size of the zones at issue in *Hill*, *Schenck*, or *Madsen* to assess the constitutionality of the Massachusetts law. *See Bruni v. City of Pittsburgh*, 824 F.3d 353, 386 (3d Cir. 2016) ("*McCullen* never referenced the size of the approved zone in *Madsen* or that the Massachusetts zones were actually smaller. Those cases turned on their distinct factual records, not a simple difference in real estate.").

Significantly, nowhere in *McCullen* did the Court suggest that Massachusetts could have addressed its concerns with a smaller and allegedly less burdensome zone. *McCullen* stands for the proposition that, where there are alternative ways of dealing with purported problems that would not entail the use of **any** buffer zone, even a relatively small buffer zone is impermissible. Metro's arguments that the Ordinance is constitutional because it is smaller than the zone in *McCullen* and is allegedly "one of the smallest buffer zones in the Unite[d] States," Metro Br. at 10, is therefore a red herring. It distracts from the analysis outlined in *McCullen* for determining the constitutionality of legislation that suppresses quintessential and protected free speech activities in a traditional public forum.

To satisfy the demands of narrow tailoring under *McCullen*, Metro cannot simply assert that the Ordinance, which eliminates protected speech in traditional public forums, is more efficient than other alternatives and is easier to enforce. Using that rationale, the City could ban all leafletting within the City because of a problem with litter, which is plainly unconstitutional. *Jobe v. City of Catlettsburg*, 409 F.3d 261, 270–71 (6th Cir. 2005). Rather, "**the government must demonstrate** that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 573 U.S. at 495 (emphasis added).

Metro fails to that make demonstration. It stands in the position of Massachusetts in *McCullen*, which claimed, "we have tried other approaches, but they do not work." *Id.* at 494. While the City provides some evidence to support its alleged **interests**, it has not come forward with demonstrable evidence to support how the Ordinance **furthers** those interests in a narrowly tailored fashion. In other words, though Metro may allege not to have the resources to monitor activities outside the **one** facility to request a buffer zone, and though hypothetical "victims/patients" allegedly do not file complaints (an assertion with no citation to the record), that doesn't mean the suppression of First Amendment liberties in a public forum is a constitutionally appropriate remedy.

In fact, the LMPD Memorandum, cited by the City, Metro Br. at 3, and submitted to the court below, reveals that the City is perfectly capable of investigating violations of state and local laws outside EMW, even though, as that memorandum

9

concludes, "most of the activity of the protestors is **clearly lawful**." [RE 38-5, PageID#1606 (emphasis added)]. Indeed, if most of the activity taking place outside EMW is lawful, and clearly so, that is all the more reason for Metro to more narrowly tailor its efforts in pursuing those hypothetical actors whose conduct is **unlawful**, rather than silencing protected speech activities of law-abiding citizens. Though the LMPD Memorandum requests "clarification," given the "very fine line" in determining whether "some activity that could be interpreted as violations of city ordinances or perhaps KRS" is actually unlawful, *id.*, Metro's answer was not to clarify (let alone, enforce) those existing laws, but to take the "path of least resistance" by "silencing speech." *McCullen*, 573 U.S. at 486.

Another exhibit submitted by the City to the court below, and cited by Metro here, Metro Br. at 10, is a video montage of activities outside EMW. [RE 38, PageID#1598]. Again, while that video might be evidence of the City's interests, it does nothing to demonstrate that the Ordinance is narrowly tailored to achieve those interests. In fact, the video itself states what has allegedly "emboldened protestors and led to a heightened state of danger": **the City's "failure to enforce current laws."** *Id.* at 2:32 (emphasis added). The most logical (and narrowly tailored) way to fight harassment, disorderly conduct, blocking sidewalks, etc.—all referenced in the LMPD Memorandum—is to prosecute those who engage in such conduct. *Cf. Schneider v. State*, 308 U.S. 147, 162 (1939) ("There are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers on the streets.").

Lawbreakers can be prosecuted without having to punish law-abiding citizens with the deprivation of their constitutional rights.

The assertion that the City does not have the manpower to enforce laws against harassment, assault, etc. is an excuse that Massachusetts did not even attempt to make in *McCullen*. And for good reason.

> Municipal authorities, as trustees for the public, have the duty to keep their communities' streets open and available for movement of people and property . . . **[s]o long as** legislation to this end does not abridge the constitutional liberty of one rightfully upon the street to impart information through speech or the distribution of literature.

*Schneider*, 308 U.S. at 160 (emphasis added). That duty of city authorities extends beyond keeping traditional public forums free of obstructions; it applies to keeping people safe within those forums.

Metro does not explain how the cost of keeping the peace at **one location**, where most activities are "clearly lawful," is so hefty a price that it must make Plaintiffs pay the cost with their First Amendment liberties. In *Schneider*, where the Supreme Court struck down ordinances that prohibited the distribution of flyers on public streets, the Court noted, "[a]ny burden imposed upon the city authorities in cleaning and caring for the streets as an indirect consequence of such distribution results from the constitutional protection of the freedom of speech and press." *Id.* at 162. That same principle applies here. As this Court has observed:

11

> In a balance between two important interests—free speech on one hand, and the state's power to maintain the peace on the other—the scale is heavily weighted in favor of the First Amendment. **Maintenance of the peace should not be achieved at the expense of the free speech.**

*Bible Believers*, 805 F.3d at 252 (internal citation omitted) (emphasis added).

Metro does not provide sufficient or demonstrable evidence why it could not more vigorously enforce laws already on the books, why it did not consider a local version of the federal Freedom of Access to Clinic Entrances Act (FACE Act), or why it could not pursue targeted injunctions against bad actors. *See McCullen*, 573 U.S. at 490–93 (setting forth potential ways the state could have handled abortion-related turbulence without resorting to substantially burdening speech).[1] Moreover, if the City can work with EMW to document and prosecute speakers crossing a painted line, it can also work with EMW to document persons who actually engage in bad conduct, such as assault, harassment, etc. Such evidence could be used not just for individual prosecutions, but to seek injunctions against specific lawbreakers. *See McCullen*, 573 U.S. at 495 ("[I]f Commonwealth officials can compile an extensive record of obstruction and harassment to support their preferred legislation, we do not see why they cannot do the same to support injunctions and prosecutions against those who might deliberately flout the law."). Injunctive relief against those who engage in harassment,

---

[1] *See also Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2376 (2018) (indicating that simply alleging that less restrictive alternatives are not effective is insufficient; evidence to that effect must be produced: "California argues that it has already tried an advertising campaign [as a less restrictive alternative]. But California has identified no evidence to that effect.").

obstruction, etc. would not burden more speech, as Metro claims, Metro Br. at 20, but "focuses on the precise individuals and the precise conduct causing a particular problem." *McCullen*, 573 U.S. at 492. In addition, it is not Metro that would issue an injunction against bad actors, as the City seems to think, *see* Metro Br. at 20, but a court of law which, "given the equitable nature of injunctive relief," could "tailor a remedy to ensure that it restricts no more speech than necessary." *McCullen*, 573 U.S. at 492.

Finally, Metro says precious little about Harpring and Kenney's argument that the Ordinance fails narrow tailoring because of its overinclusiveness. *See* Harpring Br. at 28–30; *see also McCullen*, 573 U.S. at 493 (holding that to create buffer zones outside all reproductive facilities in the state, with problems only arising at one such facility, "is hardly a narrowly tailored solution"). This is remarkable, though not surprising, as the facts of this case do not support the reach of the Ordinance. Though the Ordinance creates or authorizes buffer zones outside **all** health care facilities within the City, the City has come forward with no evidence to support that such a sweeping regulation of speech is necessary—or even rational. It cites no health or safety issues at any healthcare facility other than EMW. It does not explain how allowing health care facilities to request buffer zones on public sidewalks for any reason at all (which "shall" be created upon request, no questions asked) poses no constitutional problems, even where those zones could be imposed for discriminatory reasons. Metro failed to prove that the overinclusive nature of the Ordinance, creating (or authorizing) buffer zones outside **all** healthcare facilities, to deal with purported problems **only** at EMW, satisfies the

"demand [of] a close fit between ends and means" that narrow tailoring requires. *Id.* at 486.[2] *See also Frisby v. Schultz*, 487 U.S. 474, 485 (1988) ("A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy").

In sum, *McCullen*'s intermediate scrutiny analysis (which Metro attempts to characterize as "nitpicking," Metro Br. at 19) lays out how Metro could have addressed concerns at EMW without closing off a portion of a traditional public forum to speakers. The Ordinance flunks *McCullen*'s test.

**B.** ***Hill v. Colorado***

The Ordinance is unconstitutional under *McCullen*, and *Hill* does not save it. Plaintiffs have already explained why *Hill* is irrelevant to deciding this case, and there is no reason to repeat those arguments here. *See* Harpring Br. at 34-37; *see also* Amicus Brief of Attorney General for the Commonwealth of Kentucky, at 14-26.

Two points, however, are in order. First, *Hill*'s remark that "[a] bright-line prophylactic rule may be the best way to provide protection, and, at the same time . . . protect speech itself," Metro Br. at 10, stands in sharp contrast to *McCullen*. That case, as previously argued, did not rely on *Hill* in any part of its legal analysis, let alone invoke

---

[2] While *Hill* states that it is of "no constitutional significance" that "coverage of a statute is broader than the specific concern that led to its enactment," that language comes from the Court's consideration of the petitioners' overbreadth challenge. *See Hill*, 530 U.S. at 730–32 (Sec. V). But here, as in *McCullen*, the overinclusiveness of the law is a failure of **narrow tailoring**, separate from overbreadth considerations. *See McCullen*, 573 U.S. at 512 n.9 (noting that because the law was not narrowly tailored, it did not need to consider petitioners' overbreadth challenge).

*Hill* to support Massachusetts's prophylactic speech regulation. In fact, the Court noted "the First Amendment virtues of targeted injunctions **as alternatives to broad, prophylactic measures**." *McCullen*, 573 U.S. at 492 (emphasis added).

Lt. Stewart testified that "the buffer zone ordinance is much easier to enforce" than other ordinances [Stewart Depo., RE 47, PageID#2077], and the City says that the Ordinance "aids law enforcement officers with a bright-line rule to ensure patients and speech are protected while removing some of the burden from LMPD." Metro Br. at 10. But *McCullen* could not be plainer: making a police officer's job "so much easier" is "not enough to satisfy the First Amendment." 573 U.S. at 495. "A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency." *Id.*

Second, as discussed previously in Section I, while the Ordinance bans Plaintiffs from standing on the public sidewalk immediately outside the entrance of EMW, the law upheld in *Hill* would allow them to do just that. As explained, Plaintiffs do not use signs or bullhorns, but, through close, personal conversations, desire to give women a final word of hope before walking through the doors of EMW. That cannot be accomplished from five feet away where escorts surround patients in the buffer zone, protestors loudly drown out their message, and Harpring must raise his voice to share his message. That argument is hardly "absurd," as the City exclaims. Metro Br. at 28.

It cannot be seriously questioned that the Ordinance is modeled on the law struck down in *McCullen*, not the law upheld in *Hill*. The only noteworthy differences

between the law in *McCullen* and the Ordinance (which are *verbatim* the same in certain sections) are (1) to what facilities the zones apply, (2) the size of the zones, and (3) when and how the zones are created. But none of these differences render the Ordinance more narrowly tailored than the law in *McCullen*. The Massachusetts law, unlike the Ordinance, applied only to "reproductive health care facilities," 573 U.S. at 464, and contained, moreover, operative language that the Ordinance is lacking, *i.e.*, that zones are only enforceable "when clearly marked and posted." *Id.* at 472.

Also, as in *McCullen*, the size of the buffer zone is irrelevant when Metro has failed to demonstrate that any speech-suppressing zone would be a narrowly tailored remedy to address health and safety concerns. As mentioned previously, among *McCullen*'s suggested "variety of approaches" that Massachusetts could have adopted to further its interests, one approach is notably absent: a smaller zone. *Id.* at 494. The reason for this is obvious: such fixed zones "exclude individuals from areas historically open for speech and debate," *id.*, and raise the concern that a government "has too readily forgone options that could serve its interests . . . without substantially burdening" protected speech. *Id.* at 490.

The City evades the critical difference between the eight-foot *floating bubble* zone in *Hill* and the ten-foot *fixed buffer* zone under the Ordinance by ignoring the role consent played in *Hill*—consent that is irrelevant under the Ordinance. Indeed, Metro admits that the Ordinance places a burden **on the patient** who may want to hear what Plaintiffs wish to say: "[i]f a patient wants to engage," she can "walk a few feet and step

out of the buffer zone." Metro Br. at 28; *Stanley*, 394 U.S. at 564. The law in *Hill* placed no such burden on patients—the very persons, after all, the law was allegedly designed to protect. *Hill* allowed for the very counseling Harpring and Kenney wish to engage in when the patient consents. Not so here, where the Ordinance not only burdens sidewalk counselors but patients as well.[3]

## III. The Ordinance Violates Due Process.

### A. When and How Zones are Operational

Metro claims that the words of the Ordinance are "clear and unambiguous": buffer zones are only created when the Department of Public Works ("DPW") paints the lines when requested. Metro Br. at 25. But the court below would not have needed to provide a limiting construction of the Ordinance if the language was as clear as Metro claims. [PI Order, RE 55, PageID#2289.] And Metro's argument in support of that interpretation is simply to repeat, in different words, what the Ordinance says. Metro Br. at 25-26.

There is no need to rehash in full what Plaintiffs have already argued on this point. *See* Harpring Br. at 41–45. In not providing that the buffer zones are only

---

[3] It bears mentioning that *Hill* has recently (and again) come under fire by Justices of the Supreme Court. In *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, Justice Thomas, in a dissent joined by Justices Gorsuch and Barrett, directly castigates *Hill*, calling it "erroneous," "long-discredited," "an aberration," "'absurd,'" and "defunct," among other criticisms. 212 L. Ed. 2d 418, 437-449 (U.S. 2022) (Thomas, J., dissenting). The majority's response was not to defend *Hill* but to say, "we do not 'resuscitat[e]' a decision that we do not cite. . . ." *Id.* at 430 (majority op.).

enforceable when "clearly marked and posted," as did the buffer zone laws in *McCullen* and *Turco*, the Ordinance is missing the very language critical to its operation. *Id.* at 41–42. And without that language, (1) the public cannot be certain where and when buffer zones are in place outside healthcare facilities, and (2) law enforcement officials are free to adopt any interpretation they please on the scene. That does not comport with the Fourteenth Amendment's requirement of due process. As Plaintiffs have already pointed out, the lower court's interpretation is not binding on state courts where prosecutions under the Ordinance will be adjudicated. *Id.* at 44.

Nonetheless, assuming *arguendo* that the City's interpretation is accurate, Metro largely ignores Plaintiffs' further due process argument that, according to the City's own reading of the Ordinance, every healthcare facility in the City is now empowered to have the DPW create a no-speech zone outside its entrance for any potentially discriminatory reason—or no reason at all. *Id.* at 43. In fact, Metro does not dispute that such facilities have been so empowered, but shrugs it off as involving "unrealistic hypotheticals." Metro Br. at 25–26. But as Plaintiffs already pointed out—ignored by Metro here—the problem is not **whether** such facilities will have zones created for content- or viewpoint-based reasons, the problem is that there's nothing in the Ordinance that prevents them from doing so. Harpring Br. at 43 (citing *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 133 n.10 (1992)).

Thus, according to Metro's own understanding of how it operates, the Ordinance not only violates due process, by granting private entities unbridled discretion to have

buffer zones imposed, it further exposes the Ordinance's Achilles's heel: granting **every** healthcare facility within the City the legal authority to suppress speech in traditional public forums for content- or viewpoint-based reasons, because of conduct-based problems at only **one location**, is hardly a narrowly tailored solution. *McCullen*, 573 U.S. at 493.

### B. Crossing Through the Zones

In response to the question posed by Plaintiffs, *i.e.*, whether they can cross through the zone outside EMW to get to the other side while engaging in sidewalk counseling, Metro's response is—ironically enough—vague. Metro says, "if the person is not walking to a different destination, they are prohibited, by the Ordinance, from entering the buffer zone." Metro Br. at 27. Based on this, one might think Metro believes that the Ordinance allows such passage (the other side of the buffer zone, after all, is a "different destination"), but Metro immediately goes on to state, "walking around the buffer zone to get to the other side is no burden to Appellants." *Id.* There would be no reason to say Plaintiffs can walk **around** the zone without any burden if Metro thinks Plaintiffs can walk **through it**.

The vagueness of the Ordinance, and Metro's vague discussion of it, is further compounded by what happened to Plaintiff Kenney. Kenney was at one time informed by an LMPD officer that she was permitted to cross through the zones in order to continue sidewalk counseling on the other side. [Verified Complaint, 3:21-cv-691, RE 1, PageID#9, ¶ 46.] And yet, Kenney was later issued a formal warning by the City—

not for standing or remaining in the buffer zone—but for "walk[ing] through the buffer zone twice in the span of twenty seconds." [Ex. B, Warning, 3:21-cv-691, RE 1-2, PageID#28.]

> Lt. Stewart described the video footage of Kenney's alleged violation as follows:

> It showed her initially standing on one side of the buffer zone, just on the outside, and rather slowly walking through the zone while she was, like, looking into the front doors. And as she got to the other side of the zone, she stood there for a few seconds and then immediately proceeded back across it in a similar manner.

[Stewart Depo., RE 47, PageID#2060.]

Based on what happened to Kenney and the position (vaguely) asserted in Metro's opposition brief, one might think the City has taken the position that Plaintiffs cannot cross through the zone to get to the other side, but must walk around it. However, with respect to the Ordinance's exemption for "using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility," Ordinance, Sec. B(2)(b), Lt. Stewart had this to say: "we've determined that means that someone can walk through the zone if they're going from one side to the other"—and that "someone" includes sidewalk counselors and/or protestors. [Stewart Depo., RE 47, PageID#2067.]

In light of the foregoing conflicting interpretations (not to mention being issued a formal warning), it is no wonder that Kenney thinks she is never permitted to enter the buffer zone. As she testified, "If I have to get from one side of the buffer zone to the other, I have to go out into the street." [Kenney Depo., RE 46, PageID#1942.] And

20

even though Lt. Stewart testified that one can cross the buffer zone to get the other side—a position apparently contrary to the one stated in Metro's opposition brief—Kenney was issued a warning for doing just that.

The vagueness of the Ordinance cannot seriously be questioned. The City has spoken out of both sides of its mouth regarding what Plaintiffs can and cannot do while sidewalk counseling outside EMW. The Fourteenth Amendment's Due Process Clause does not countenance it.

## IV. Plaintiffs Suffer Irreparable Injury

Metro says that Plaintiffs are not irreparably injured in the exercise of their constitutional rights, arguing that the Ordinance does not impose a burden on their speech. Plaintiffs have already responded to that argument, and there is no need to restate those arguments here. *See, supra*, at Sec. I.

Metro also says that Plaintiffs suffer no irreparable harm for the loss of exercising their free speech rights because the Ordinance protects "unwilling listeners." Metro Br. at 29–30 (citing *Hill*, 530 U.S. at 716). *McCullen*, however, is clear: "[i]f . . . the speech outside Massachusetts abortion clinics caused offense or made listeners uncomfortable, such offense or discomfort would not give the Commonwealth a content-neutral justification to restrict the speech." 573 U.S. at 481. Indeed, *McCullen* states that a law is content-based if it is "concerned with [the] undesirable effects that arise from the 'direct impact of speech on its audience' or '[l]isteners' reactions to speech.'" *Id.* (quoting *Boos v. Barry*, 485 U.S. 312, 321 (1988)); *see also Gerber v. Herskovitz*, 14 F.4th

500, 510 (6th Cir. 2021) (quoting *McCullen*). In other words, Metro uses a content-based justification, *i.e.*, the protection of "unwilling listeners," to argue that Harpring and Kenney are not irreparably harmed by the Ordinance. *McCullen* squarely prohibits such a justification, as do a legion of other decisions. *See Bible Believers*, 805 F.3d at 247 ("Listeners' reaction to speech is not a content-neutral basis for regulation.") (quoting *Forsyth*, 505 U.S. at 134); *Boos*, 485 U.S. at 321 ("Regulations that focus on the direct impact of speech on its audience" are content-based).

The protection of speech in public rights of way that "one might otherwise tune out," is "a virtue, not a vice," *McCullen*, 573 U.S. at 476, and "the guiding First Amendment principle that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content applies with full force in a traditional public forum." *Id.* at 477 (citation omitted). And, as noted previously, the City's **assumption** that the individuals that Plaintiffs initiate conversations with are **unwilling** listeners is contrary to the record, which indicates that many **willing** listeners have exercised their right to receive information and to converse with Plaintiffs. The problematic nature of the government seeking to exercise a paternalistic prerogative to interfere with conversations on a public sidewalk due to the government's *en masse* assessment of what women are "willing" to hear is readily apparent.

In short, where a party can "establish a likelihood of success on the merits of its First Amendment claim, it also has established the possibility of irreparable harm as a result of the deprivation of the claimed free speech rights." *Mich. Catholic Conference v.*

*Burwell*, 755 F.3d 372, 398 (6th Cir. 2014) (quoting *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)). Plaintiffs have done so and have thus satisfied the irreparable injury factor. *See Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 412 (6th Cir. 2014) ("With regard to the factor of irreparable injury . . . it is well-settled that loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (cleaned up).

## V.     Remaining Preliminary Injunction Factors Favor Plaintiffs

In addition to a likelihood of success on the merits and irreparable injury, this Court must also consider whether the injunction would cause substantial harm to others and whether the public interest would be served by the issuance of an injunction. *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007).

Metro says that a preliminary injunction would cause harm to others and not be in the public interest because "Plaintiffs and protestors will feel more empowered than ever to continue the harassment, assaults, stalking and intimidation of patients." Metro Br. at 31. Not only does this (false) alarm contradict the LMPD findings that most of the behavior outside EMW is "clearly lawful," it is baseless. The City has not come forward with any evidence that Plaintiffs have engaged in harassment, assaults, etc., nor does any such evidence exist. The City fails to appreciate—as it has throughout the entirety of this case—that, in addition to any governmental interests, constitutional freedoms are at stake. The standard is clear: (1) where "the plaintiff shows a substantial

likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere its enjoinment," and (2) "it is always in the public interest to prevent the violation of a party's constitutional rights." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 400 (6th Cir. 2001) (citation omitted).

Despite its claims to the contrary—claims it uses as an excuse to shut down speech on a matter of public concern in a traditional public forum—the City is perfectly capable of dealing with bad actors who engage in illegal conduct without substantially burdening speech. Instead of following the roadmap set out in *McCullen* for how Metro might have done so, it chose the "path of least resistance" by "silencing speech." *McCullen*, 573 U.S. at 486. It is in the public's interest to prevent such enforced silence.

## CONCLUSION

Plaintiffs-Appellants Edward Harpring and Mary Kenney respectfully request that this Court reverse the district court's denial of their motion for a preliminary injunction and enter a preliminary injunction while the case proceeds to the merits in the district court.

Respectfully submitted,

/s/ Francis J. Manion

EDWARD L. WHITE III  
ERIK M. ZIMMERMAN*  
AMERICAN CENTER FOR LAW  
  & JUSTICE  
3001 Plymouth Road, Suite 203  
Ann Arbor, Michigan 48105  
Tel.: 734-680-8007  
Email: ewhite@aclj.org

*not admitted in this jurisdiction

Dated: May 23, 2022

FRANCIS J. MANION  
GEOFFREY R. SURTEES  
AMERICAN CENTER FOR LAW  
  & JUSTICE  
Post Office Box 60  
New Hope, Kentucky 40052  
Tel.: 502-549-7020  
Email: fmanion@aclj.org

*Counsel for Plaintiffs-Appellants Edward Harpring and Mary Kenney*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) because it contains 6,499 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b). I further certify that the attached brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Garamond font.

/s/ Francis J. Manion
FRANCIS J. MANION
AMERICAN CENTER FOR LAW
  & JUSTICE
Post Office Box 60
New Hope, Kentucky 40052
Tel.: 502-549-7020
Email: fmanion@aclj.org

*Counsel for Plaintiffs-Appellants*
*Harpring and Kenney*

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was electronically filed with the Clerk of Court for the United States Court of Appeals for the Sixth Circuit on May 23, 2022, using CM/ECF. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

/s/ Francis J. Manion
FRANCIS J. MANION
AMERICAN CENTER FOR LAW
 & JUSTICE
Post Office Box 60
New Hope, Kentucky 40052
Tel.: 502-549-7020
Email: fmanion@aclj.org

*Counsel for Plaintiffs-Appellants*
*Harpring and Kenney*